# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Ryan v. Fox Television Stations, Inc.*, 2012 IL App (1st) 120005

---

| | |
|---|---|
| Appellate Court Caption | JAMES RYAN, Plaintiff-Appellee, v. FOX TELEVISION STATIONS, INC., FOX TELEVISION HOLDINGS, INC., LARRY YELLEN, DANE PLACKO, MARSHA BARTEL, CAROL FOWLER, BETTER GOVERNMENT ASSOCIATION, INC., and ANDY SHAW, Defendants-Appellants. |
| District & No. | First District, Second Division<br>Docket Nos. 1-12-0005, 1-12-0007 cons. |
| Filed<br>Rehearing denied | October 23, 2012<br>November 19, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for defamation, false-light invasion of privacy, intentional infliction of emotional distress and invasion of privacy by intrusion upon seclusion filed by a circuit court judge in response to an investigative report that certain judges were leaving the courthouse before the end of the business day, defendants failed to sustain their burden of establishing that the complaint was barred by the SLAPP Act. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-006258; the Hon. James Egan, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Steven P. Mandell, Steven L. Baron, and Sharon R. Albrecht, all of Mandell Menkes LLC, and Samuel Fifer, Leah R. Bruno, and Kristen C. Rodriguez, all of SNR Denton, both of Chicago, for appellants. |
| | John S. Fotopoulos, of Orland Park, for appellee. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion. Presiding Justice Harris and Justice Quinn concurred in the judgment and opinion. |

## OPINION

¶ 1     In 2010, WFLD Fox News Chicago aired an investigative report on the working hours of judges in the circuit court of Cook County. The report presented information suggesting that at least four judges, one of whom was identified as plaintiff James Ryan, had been neglecting their official duties by leaving courthouses well before the end of the business day, contrary to the stated policy of the chief judge of the circuit court. The report prompted an inquiry from the supreme court and caused the chief judge of the circuit court to discipline the judges involved by transferring them to other duties. Plaintiff filed this lawsuit against defendants, which in its current form alleges defamation, false-light invasion of privacy, intentional infliction of emotional distress, and invasion of privacy by intrusion upon seclusion. Defendants moved to dismiss the complaint on the ground that it is a "Strategic Lawsuit Against Public Participation" (SLAPP), which is barred under the Citizen Participation Act (735 ILCS 110/1 *et seq.* (West 2010)). The circuit court denied the motion. We affirm.

¶ 2     The investigative report originally aired in installments over four nights starting on May 24, 2010. The report was a collaborative effort between WFLD, which is owned by some of the defendants, and defendant Better Government Association, Inc., a nonprofit advocacy group. (The remaining individual defendants were involved in some aspect of the investigation or the presentation of the report.) The report's first installment detailed the basic findings of the investigation. According to the report, unofficial logs prepared by the Cook County sheriff's office revealed that a large number of courtrooms in the Daley Center were not open during business hours, which normally ran until 4 p.m. Investigators confirmed this finding by independently surveying the courtrooms during business hours. By means of hidden cameras, the investigators also confirmed that a number of judges were leaving before the end of business hours. In one of the most explosive portions of the report, a reporter found one judge sunbathing outside of her home at around 2 p.m. on a workday. After being confronted by the reporter, the judge argued that she had left the courthouse early that day only because she had completed her call and had nothing further to do.

¶ 3    The report also contained a segment specifically regarding plaintiff. The report stated, "We caught him leaving the courthouse early three times. On a rainy October day, he was home by 1:18 p.m. He never returned our calls." This statement was accompanied by images of a car parked in the driveway of a house. The report named two other judges who had allegedly been seen leaving before the end of business hours. The report also included statements by defendant Andy Shaw to the effect that judges should be required to punch in and out of courthouses in order to ensure that they are working during business hours.

¶ 4    The report's second installment focused on an analysis of the costs to taxpayers of the Cook County judicial system, including judicial salaries and benefits, and it also included reactions to the investigation from members of the judiciary and the public. The report also examined various methods of disciplining and supervising judges. The report included the following exchange by defendant Larry Yellen, a reporter, and WFLD anchor Robin Robinson:

"ROBINSON: Sounds like a lack of supervision, like somebody didn't put a framework in place to get the most effective system there is.

YELLEN: You know, it might be a lack of accountability because judges are elected, as we pointed out in the piece. They're elected, that means they're accountable to the voters, but you know and I know that when people go to vote on judges, they don't know the details of whom they're voting on. It's the bottom of the ballot, everybody's tired by then, and they can't recognize all those names."

¶ 5    At the conclusion of this installment, Robinson announced that the previous night's installment contained an error regarding the evidence against plaintiff. Robinson stated:

"Last night's story, by the way, identified Judge Jim Ryan [*i.e.*, plaintiff] as one of the judges leaving work early. We watched [plaintiff] leaving the courthouse and said he went home. But the house and the car we showed actually belonged to a neighbor. Our bad. While we saw the judge leave work early, we really don't know where he went. We do apologize for that mistake."

¶ 6    The report's third segment focused on the Illinois Supreme Court's reaction to the previous two segments. Joe Tybor, the court's press secretary, stated that the judges' alleged behavior was "totally unacceptable and, in the court's mind, cannot be tolerated." Tybor also indicated that the supreme court planned to discuss the situation with Tim Evans, the chief judge of the circuit court, and other supervising judges in order to further investigate the situation and decide on corrective measures. Chief Judge Evans stated that he intended to take action if shown some evidence of wrongdoing by the judges involved.

¶ 7    The next day, May 27, 2010, plaintiff filed the original complaint in this case, alleging a single count of defamation. (The complaint was amended about a year later to include the other three counts now at issue.) The complaint centered on the report's claim during its first installment (which Robinson conceded was incorrect during the second installment) that plaintiff was at home with his car parked in the driveway prior to 4 p.m. on a workday. Plaintiff asked for damages of $7 million.

¶ 8    The fourth and final installment of the report aired the following night, May 28, 2010. This report detailed the fallout from the investigation. According to the report, Chief Judge

Evans reassigned all of the judges involved to different duties and arranged for the judges to receive "mentoring" from other, veteran judges. The report explained that, because judges are elected, reassignment is one of the few supervisory tools that the chief judge can use to discipline judges.

¶ 9    Defendants originally moved to dismiss plaintiff's complaint based on immunity under the Citizen Participation Act in late 2010. After the circuit court denied the motion, defendants twice petitioned for leave to appeal, the first time under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) and the second under Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010). We denied leave to appeal both times.[1] While the second attempted appeal was pending, plaintiff filed his amended complaint. The amended complaint contained four counts: defamation *per se* (count I), based on the report's allegedly false claim that he had left work three times and was at home at 1:18 p.m. on October 9, 2009; "false light" (count II), based on essentially the same facts; intentional infliction of emotional distress (count III), based on defendants' alleged indifference to the falsity of their report and the harm that it caused plaintiff; and intrusion upon seclusion (count IV), based on a portion of the report that included video of plaintiff walking in a secure parking lot that is in a restricted area and is not open to the public. Plaintiff asked for $7 million in damages on each count.

¶ 10    Defendants filed combined motions to dismiss the amended complaint under section 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-619.1 (West 2010)), which argued among other things that defendants were entitled to immunity under the Act. After extensive briefing and oral argument, the circuit court denied the portion of the motions related to the Act. (The remaining portions of the motions are apparently still pending in the circuit court.) Defendants petitioned for leave to appeal under Illinois Supreme Court Rule 306(a)(9) (eff. Feb. 16, 2011), which we granted.

¶ 11    The sole issue on appeal is whether plaintiff's suit should be dismissed because it is barred under the Act. A motion to dismiss based on immunity under the Act is properly raised under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2010)), which "admits the legal sufficiency of the plaintiff's claim but asserts certain defects or defenses outside the pleadings which defeat the claim." *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55; see also *id.* ¶ 54 ("Immunity from tort liability pursuant to statute is an affirmative matter properly raised in a section 2-619 motion to dismiss.").

---

[1]At the time, there was a great deal of uncertainty whether and under what circumstances denial of a motion to dismiss based on immunity under the Act is an appealable interlocutory order. Although the Act purported to mandate an expedited interlocutory appeal from an order denying such a motion (see 735 ILCS 110/20(a) (West 2010)), this provision raised separation-of-powers issues. See *Wright Development Group, LLC v. Walsh*, 238 Ill. 2d 620, 642-44 (Freeman, J., specially concurring, joined by Thomas and Burke, JJ.) (discussing how to obtain jurisdiction under Rule 304(a)); see also generally *Stein v. Krislov*, 405 Ill. App. 3d 538 (2010) (jurisdiction under Illinois Supreme Court Rule 307 (eff. Feb. 26, 2010); *Mund v. Brown*, 393 Ill. App. 3d 994 (same). The supreme court resolved the problem in early 2011 by amending Rule 306 in order to provide for an interlocutory appeal by permission in this situation. See Ill. S. Ct. R. 306(a)(9) (eff. Feb. 16, 2011).

"When ruling on the motion, the court should construe the pleadings and supporting documents in the light most favorable to the nonmoving party. [Citation.] The court must accept as true all well-pleaded facts in plaintiff's complaint and all inferences that may reasonably be drawn in plaintiff's favor. [Citation.] The question on appeal is whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law. [Citation.] Our review is *de novo*." (Internal quotation marks omitted.) *Id.* ¶ 55

¶ 12       In 2007, the legislature enacted the Citizen Participation Act in order to combat the rise of what have been termed "Strategic Lawsuits Against Public Participation," commonly called SLAPPs. A SLAPP is a meritless lawsuit that is used to retaliate against a defendant for attempting to participate in government by exercising some first amendment right such as the right to free speech or the right to petition. See *Sandholm v. Kuecker*, 2012 IL 111443, ¶¶ 33-34. "Plaintiffs in SLAPP suits do not intend to win but rather to chill a defendant's speech or protest activity and discourage opposition by others through delay, expense, and distraction. *** While the case is being litigated in the courts, however, defendants are forced to expend funds on litigation costs and attorney fees and may be discouraged from continuing their protest activities." *Id.* ¶ 34.

¶ 13       The traditional SLAPP paradigm involves a large and powerful corporation or entity that sues an individual or grassroots political organization for defamation, intentional interference with economic advantage, or some other similar tort. See Mark J. Sobczak, Comment, *SLAPPed in Illinois: The Scope and Applicability of the Illinois Citizen Participation Act*, 28 N. Ill. U. L. Rev. 559, 563 (2008). One of the most socially damaging aspects of SLAPPs is the fact that although plaintiffs nearly always lose (see *Sandholm*, 2012 IL 111443, ¶ 34), the defendants in such cases can be financially devastated by the costs of defending the suit or deterred into silence by the threat of the enormous monetary damages demanded by the plaintiffs. See Sobczak, *supra*, at 564-65. In response to this problem, nearly 30 states have adopted anti-SLAPP legislation that allows for "expedited judicial review, summary dismissal, and recovery of attorney fees for the party who has been 'SLAPPed.'" *Sandholm*, 2012 IL 111443, ¶ 35.

¶ 14       In Illinois, the legislature declared four public policy goals for the Act:

"It is in the public interest and it is the purpose of this Act to [1] strike a balance between the rights of persons to file lawsuits for injury and the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government; [2] to protect and encourage public participation in government to the maximum extent permitted by law; [3] to establish an efficient process for identification and adjudication of SLAPPs; and [4] to provide for attorney's fees and costs to prevailing movants." 735 ILCS 110/5 (West 2010).

The legislature further declared that the Act "shall be construed liberally to effectuate its purposes and intent fully." 735 ILCS 110/30(b) (West 2010).

¶ 15       As can be seen from the legislature's public policy statement, the Act seeks not only to protect individuals from meritless, retaliatory SLAPPs but also to allow plaintiffs who have legitimately been wronged to receive compensation. But this laudable goal runs almost

immediately into the most intractable problem associated with SLAPPs: they are very hard to distinguish from normal lawsuits. See *Sandholm*, 2012 IL 111443, ¶ 35 ("SLAPPs masquerade as ordinary lawsuits and may include myriad causes of action, including defamation, interference with contractual rights or prospective economic advantage, and malicious prosecution." (Internal quotation marks omitted.)). A SLAPP is often identifiable by its lack of merit and because it is filed against defendants who are exercising their first amendment rights, but this does not mean that all lawsuits that lack merit or that implicate first amendment activities are SLAPPs.

¶ 16    To help overcome this problem, the legislature established a standard for invoking immunity under the Act. Section 15 states:

"This Act applies to any motion to dispose of a claim in a judicial proceeding on the grounds that the claim is based on, relates to, or is in response to any act or acts of the moving party in furtherance of the moving party's rights of petition, speech, association, or to otherwise participate in government.

  Acts in furtherance of the constitutional rights to petition, speech, association, and participation in government are immune from liability, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome." 735 ILCS 110/15 (West 2010).

Section 20(c) further mandates that the circuit court "shall grant the motion and dismiss the judicial claim unless the court finds that the responding party has produced clear and convincing evidence that the acts of the moving party are not immunized from, or are not in furtherance of acts immunized from, liability by this Act." 735 ILCS 110/20(c) (West 2010).

¶ 17    The trouble with the standard as written, however, is that if it is applied to the letter then the Act would mandate dismissal of *every* lawsuit that implicated a defendant's first amendment activities regardless of whether the plaintiff's claims were meritorious or not, essentially creating absolute immunity for torts committed while exercising first amendment rights. The supreme court recently confronted this problem in *Sandholm v. Kuecker*, 2012 IL 111443. The supreme court noted that the standard articulated in the Act did not track the legislature's stated public policy, which required the court to read into the Act the additional requirement that, in order to qualify for dismissal, a claim must be affirmatively identified as a meritless, retaliatory SLAPP. See *id.* ¶ 45; see also *id.* ¶ 50 ("We believe that, had the legislature intended to radically alter the common law by imposing a qualified privilege on defamation within the process of petitioning the government, it would have explicitly stated its intent to do so."); *id.* ¶ 51 ("We simply do not believe that, in enacting the anti-SLAPP statute, the legislature intended to abolish an individual's right to seek redress for defamation or other intentional torts, whenever the tortious acts are in furtherance of the tortfeasor's rights of petition, speech, association, or participation in government.").

¶ 18    Under *Sandholm*, the threshold step in analyzing a motion to dismiss based on the Act is to "first determine whether the suit is the type of suit the Act was intended to address." *Id.* ¶ 43. We recently summarized *Sandholm*'s approach in *Hammons v. Society of Permanent Cosmetic Professionals*, 2012 IL App (1st) 102644. Under *Sandholm*, a lawsuit may only be dismissed due to immunity under the Act if:

"(1) the defendants' acts were in furtherance of their right to petition, speak, associate, or otherwise participate in government to obtain favorable government action; (2) the plaintiffs' claims are solely based on, related to, or in response to the defendants' 'acts in furtherance'; and (3) the plaintiffs fail to produce clear and convincing evidence that the defendants' acts were not genuinely aimed at solely procuring favorable government action." *Id.* ¶ 18.

¶ 19　　It is indisputable that defendants' actions in this case satisfy the first prong of the test. The investigatory report that defendants produced uncovered questionable activity by members of the judiciary in the performance of their official duties. Defendants communicated the findings of their investigation to the public and to members of local and state government via a televised newscast. Perhaps most importantly, the report sought comment from the Illinois Supreme Court and Chief Judge Evans on the investigation's findings and urged them to take action. Such activity is well within the scope of the Act, and in fact the investigatory report at issue here is an excellent example of the kind of activity that the legislature sought to protect, as shown by the Act's own language. The legislature noted in the Act's public policy statement that "[t]he information, reports, opinions, claims, arguments, and other expressions provided by citizens are vital to effective law enforcement, the operation of government, *** and the continuation of representative democracy." 735 ILCS 110/5 (West 2010); *cf. Hammons*, 2012 IL App (1st) 102644, ¶¶ 19-20 (finding that the movant's activities were not an attempt at public participation within the meaning of the Act).

¶ 20　　Yet merely because defendants' activities are the kind that the Act is designed to protect does not necessarily mean that plaintiff's lawsuit is a SLAPP and is therefore subject to dismissal under the Act. The next step in the analysis is to determine whether plaintiff's claim is "solely based on" defendants' protected acts. *Sandholm* stated that a lawsuit is not "solely based on" protected acts and therefore is not subject to dismissal under the Act if "a plaintiff files suit genuinely seeking relief for damages for the alleged defamation or intentionally tortious acts of defendants." *Sandholm*, 2012 IL 111443, ¶ 45. This prong of the analysis is the central issue in this case.

¶ 21　　To satisfy its burden under this prong of the test, a movant[2] must affirmatively demonstrate that the nonmovant's claim is a SLAPP within the meaning of the Act, that is, that the claim is meritless and was filed in retaliation against the movant's protected activities in order to deter the movant from further engaging in those activities. See *id.* ¶ 57 ("Plaintiff's suit does not resemble in any way a strategic lawsuit intended to chill participation in government or to stifle political expression. It is apparent that the true goal of plaintiff's claims is not to interfere with and burden defendants' free speech and petition rights, but to seek damages for the personal harm to his reputation from defendants' alleged

---

[2]It is important to note here that *Sandholm* expanded the analysis regarding the relative burdens of the parties. Prior to *Sandholm*, the movant's burden was limited to showing only that it had engaged in protected activity. See *Wright Development Group, LLC v. Walsh*, 238 Ill. 2d 620, 635-36 (2010).

defamatory and tortious acts. Defendants have not met their burden of showing that plaintiff's suit was based solely on their petitioning activities."); see also *id.* ¶¶ 33-34 (defining SLAPPs as meritless and retaliatory).

¶ 22        Defendants' primary argument is that plaintiff's lawsuit is a SLAPP because his claims would not survive a summary motion to dismiss under section 2-615 (735 ILCS 5/2-615 (West 2010)), citing our pre-*Sandholm* decision in *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 125-26 (2010). To the extent that *Hytel* defined a "meritless" lawsuit as one that fails to state a legal claim under section 2-615, we rejected that approach in *Hammons* (see *Hammons*, 2012 IL App (1st) 102644, ¶ 21) because the supreme court made clear in *Sandholm* that a motion to dismiss based on immunity under the Act should be considered under section 2-619 rather than section 2-615. See *Sandholm*, 2012 IL 111443, ¶ 55. A motion under section 2-619 concedes the legal sufficiency of a claim (see *id.*), so whether a complaint has properly stated a claim under section 2-615 is irrelevant to the issue of merit in this context.

¶ 23        *Hytel* is still useful, however, for the question of whether a claim is retaliatory within the meaning of the Act. *Hytel* suggested two helpful factors to consider: (1) the proximity in time between the protected activity and the filing of the complaint, and (2) whether the damages requested are reasonably related to the facts alleged in the complaint and are a "good-faith estimate of the extent of the injury sustained." *Hytel*, 405 Ill. App. 3d at 126. (We again observe, as we did in *Hytel*, that this is not an exclusive list and there may well be other factors that are relevant in future cases.) Plaintiff filed his original complaint less than three days after the initial segment of the report aired. Although such a short amount of time is not necessarily dispositive evidence of retaliatory intent, it is a probative fact. But when we also consider the fact that plaintiff filed the lawsuit *before* the fourth segment aired, the inference that plaintiff intended his lawsuit to deter defendants from further publicizing their investigation's findings becomes much more plausible.

¶ 24        Further, there is the type of relief requested by plaintiff. The original complaint contained a single defamation claim and demanded compensatory damages of $7 million, as well as reserving the right to also demand unspecified punitive damages. Demanding damages in the millions for alleged defamation is a classic SLAPP scenario. See *id.* (citing Sobczak, *supra*, at 563). Moreover, the amended complaint included three additional counts that each also asked for compensatory damages of $7 million, making the total compensatory demand $28 million. Based on the nature of plaintiff's alleged injuries, it is difficult to see how such a high demand can be factually justified.[3]

¶ 25        Plaintiff argues that the reason he filed his lawsuit so quickly was because of defendants'

---

[3]In all fairness, at oral argument plaintiff's counsel did give a reason why he chose to ask for that particular amount in the complaint. Although counsel's reasoning is probative on the issue of retaliatory intent, we cannot locate his explanation in either the complaint or in any of the affidavits or other documents that were before the circuit court on the motion to dismiss. We accordingly cannot consider it as part of our analysis of the motion to dismiss. See 735 ILCS 5/2-619(a), (c) (West 2010); Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008).

claim in the first installment of the report, which incorrectly stated that plaintiff was at his home early on a workday, and because defendants continued to air footage of plaintiff (which was accompanied by allegedly defamatory voiceovers) in advertisements and teasers for the remaining installments of the report. There are several problems with this argument. First, the defendants aired a correction during the second installment of the report, apparently after plaintiff contacted defendants and advised them of the error. Yet this occurred at least two days *before* plaintiff filed this lawsuit, which raises the question of why a lawsuit was necessary to obtain a correction that plaintiff had already received. Second, plaintiff's original complaint demanded only money damages. If plaintiff's purpose in filing the lawsuit so quickly was to prevent *further* harm to his reputation, then we cannot see how a demand for $7 million rather than an injunction would resolve the problem in a way that does not involve intimidating defendants into silence.

¶ 26    Given the timing of the complaint and the speed with which it was filed, the high damages demand, and the type of relief requested, we must conclude that defendants have shown evidence of retaliatory intent. *Cf. Hytel*, 405 Ill. App. 3d at 126 (finding that the movant had shown retaliatory intent). But even though defendants have presented evidence of retaliatory intent, that alone does not make the lawsuit a SLAPP because a SLAPP is also "by definition, meritless." *Sandholm*, 2012 IL 111443, ¶ 34. Defendants must also present evidence that plaintiff's claims lack merit, but they have failed to do so here. Defendants' entire argument regarding merit relies on the mistaken impression that *Hytel*'s use of the section 2-615 standard for determining whether a claim is meritless is still good law in the wake of *Sandholm*. As we stated above, it is not. See *Hammons*, 2012 IL App (1st) 102644, ¶ 21. Moreover, defendants mistake the relative burdens of the parties on this issue, arguing that plaintiff must show that his claims have merit. While this may have held true prior to *Sandholm*, the supreme court made clear in that case that the movant (which is defendants in this situation), bears the burden of demonstrating that the nonmovant's claims are a meritless, retaliatory SLAPP. See *Sandholm*, 2012 IL 111443, ¶¶ 56-57. In order to satisfy their burden, defendants must show that there are undisputed facts that demonstrate plaintiff's claim is meritless. Rather than putting forward such facts, defendants for the most part only argue that plaintiff's complaint is insufficiently pled as a matter of law under section 2-615. Such an argument is not adequate to carry defendants' burden here.

¶ 27    The only evidence that defendants have offered that could conceivably be proof that plaintiff's claims lack merit relates to the defamation count and to a lesser extent the false light count. Plaintiff's main contention in these counts is that the report's claim that he left work early and went home on several days is false. Defendants countered this allegation with logbooks from the sheriff's office that recorded the hours during which plaintiff's courtroom was open during April 2010. The logs showed that plaintiff's courtroom was usually empty by 2 p.m. Defendants argue that plaintiff's defamation claim is therefore meritless because these logs show that the report was substantially true. See, *e.g.*, *Gist v. Macon County Sheriff's Department*, 284 Ill. App. 3d 367, 371 (1996).

¶ 28    The problem with this evidence is that it does not prove that the report's allegation that plaintiff left work early and went home on a number of days is substantially true. Indeed, it is undisputed that defendants retracted the report's central allegation that plaintiff was at

home during the workday on October 9, 2009. Nor does the fact that plaintiff's courtroom was empty after 2 p.m. on certain days prove that he left work and went home. Judges work in their private chambers as well as their courtrooms, and many judges serve on committees in their official capacities or are otherwise involved in the legal community. A judge's official duties do not require a constant presence in the courtroom itself at all times, or even in the courthouse. Substantial truth is an affirmative defense[4] that requires a defendant to show that "the 'gist' or 'sting' of the defamatory material is true." *Id.* The gist of the report was that plaintiff was neglecting his official duties because he habitually left the courthouse and went home during business hours, but the sheriff's logs prove only that plaintiff was not in his courtroom at certain times.

¶ 29     Had defendants offered undisputed evidence that the report's claims that plaintiff was neglecting his duties by going home during working hours were *actually* true, then this might be a different case. Unlike substantial truth, which is an affirmative defense, falsity is an essential element in a defamation claim (see *Troman v. Wood*, 62 Ill. 2d 184 (1975)), and the dispositive fact in *Wright* was that the defendant's allegedly defamatory statements were proven to be true both in appearance and in fact, rendering the plaintiff's claim meritless (see *Wright*, 238 Ill. 2d at 638). But defendants have not offered any similar evidence in this case. Indeed, it is undisputed that defendants retracted the report's claim that plaintiff was at home on October 9, 2009, and conceded that although they had seen defendant leave the courthouse they did not know where he went. This point could have been clarified had discovery been conducted under section 20(b) of the Act (see 735 ILCS 110/20(b) (West 2010)), but it was not.

¶ 30     In sum, although defendants presented sufficient evidence that they engaged in protected activities and that plaintiff's claims were retaliatory, they failed to show that plaintiff's claims are meritless and are therefore a SLAPP. Defendants have consequently not carried their burden under the Act and the circuit court was correct to deny defendant's motion to dismiss.

¶ 31     Affirmed.

---

[4]We assume only for the purpose of argument that an adequately proven affirmative defense means that a claim is meritless within the meaning of the Act. Merely because a plaintiff is ultimately unable to succeed in a particular claim does not necessarily mean that the claim itself is meritless as that term is used in the context of SLAPPs. Given that an affirmative defense simply allows a defendant to "avoid the legal effect of or defeat the cause of action set forth in the complaint," (735 ILCS 5/2-613(d) (West 2010)), this is an open question that must be resolved in another case.