2018 IL App (1st) 171958

No. 1-17-1958

Filed December 20, 2018

Fourth Division

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| RAMINDER CHADHA, | ) | |
| | ) | |
|     Plaintiff-Appellant and Cross-Appellee | ) | |
| | ) | |
|   v. | ) | Appeal from the |
| | ) | Circuit Court of |
| NORTH PARK ELEMENTARY SCHOOL | ) | Cook County |
| ASSOCIATION, LYNN LAWRENCE, ERIC | ) | |
| MOULTON, SWAN DEVELOPMENT | ) | No. 13 L 8785 |
| CORPORATION, DAN LUNA, AND THE CITY OF | ) | |
| CHICAGO, | ) | Honorable |
| | ) | Raymond W. Mitchell, |
|     Defendants-Appellees. | ) | Judge Presiding. |
| | ) | |
| (North Park Elementary School Association, Lynn | ) | |
| Lawrence, Eric Moulton, and Swan Development | ) | |
| Corporation | ) | |
| | | |
|     Cross-Appellants). | | |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices Gordon and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2008, plaintiff Raminder Chadha purchased a parcel of real property at 2035 West

Montrose Avenue in Chicago, Illinois (the Property). The Property was adjacent to appellee

North Park Elementary School (NPES) and contained a fire-damaged structure that had been boarded up. After Chadha had owned the Property for some time without repairing the damaged structure, appellee Eric Moulton, as an NPES board member and the president of appellee Swan Development Corporation (Swan), approached Chadha about purchasing the Property for an undisclosed client. Chadha declined Moulton's offers but did not repair the blighted structure. During this time, Chadha had been receiving notices of building code violations from the alderman's office of appellee City of Chicago (City), and the City initiated an action against him in the housing court to force him to remedy the violations. After Chadha failed to repair the structure, the housing court ordered Chadha to demolish it. Chadha demolished the structure in December 2010 and subsequently constructed a new structure on the Property.

¶ 2     After the demolition, NPES filed suit against Chadha alleging that, as a result of the demolition, he introduced lead into the ground that posed a hazard to the school children at NPES. NPES subsequently voluntarily dismissed its complaint. In 2013, Chadha filed suit against NPES alleging abuse of process for the unsubstantiated lawsuit. During discovery, Chadha received a series of e-mails between NPES board members, appellee Lynn Lawrence (then NPES's principal), and members of the alderman's office regarding the Property. Chadha filed an amended complaint adding Lawrence, Moulton, Swan, the City, and Dan Luna, a City employee, as defendants and alleging claims for civil conspiracy, tortious interference with contract, aiding and abetting, and violating the federal Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. §§ 1962(c), (d) (2012)). Chadha alleged that the communications he obtained showed that defendants conspired against him to induce him to sell the Property to NPES at a reduced price through a campaign of harassment and intimidation.

¶ 3     The circuit court granted Luna and the City's (jointly, the City Defendants) motion to dismiss the claims against them in Chadha's complaint, finding that the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1-101 *et seq.* (West 2014)) statute of limitations barred any claims against those defendants. The court denied, however, the motion to dismiss under the Citizen Participation Act (Act) (735 ILCS 110/1 *et seq.* (West 2014)) filed by NPES, Lawrence, Moulton (jointly the NPES Defendants), and joined by Swan. The NPES Defendants and Swan filed motions for summary judgment, and Chadha filed a cross-motion for summary judgment. The circuit court granted summary judgment in favor of the NPES Defendants and Swan and denied Chadha's cross-motion. Chadha now appeals that order, and the NPES Defendants and Swan filed a cross-appeal from the circuit court's denial of their motion to dismiss Chadha's complaint pursuant to the Act. For the reasons stated, we affirm the judgment of the circuit court.

¶ 4                                I. BACKGROUND

¶ 5     In July 2008, Chadha purchased the Property for $225,000 with the intention to rehabilitate the fire-damaged structure and live there with his family. Chadha acknowledged that he had no prior experience as a contractor nor any experience with the rehabilitation of fire-damaged homes. Throughout 2008 and 2009, Chadha was unable to obtain financing for his rehabilitation project and began receiving building code violations and citations from the City for issues with the Property. In the summer of 2009, Chadha sent an e-mail to NPES to determine if it was interested in purchasing the Property. At the time, NPES was exploring the possibility of expanding its facilities, and Moulton proposed to the NPES board that he contact Chadha through Swan to inspect the Property and determine how much Chadha wanted for the Property.

¶ 6    With approval from the NPES board, Moulton contacted Chadha in March 2010 and informed him that he was inquiring about purchasing the Property "on behalf of a client." Moulton began negotiating with Chadha for the sale of the Property but never disclosed that he was connected to NPES. On April 30, 2010, while Moulton and Swan were negotiating to purchase the property from Chadha, the City filed a complaint against Chadha in housing court because he had failed to correct the building code violations. The City sought an order requiring Chadha to repair the structure or, in the alternative, a demolition order. On June 7, 2010, the housing court entered an order finding that the structure on the Property was "dangerous and hazardous to the public health, safety, and welfare." The court ordered that the City enter the premises and conduct a demolition inspection. The court continued the matter to January 10, 2011.

¶ 7    On June 14, 2010, Moulton informed the NPES board that Chadha was not interested in selling the Property. In an affidavit, Moulton averred that he had limited contact with Chadha after that date, which concerned only excavation issues after the demolition of the structure on the Property. On June 21, 2010, Chadha entered into a contract with Soto Home Remodelers (Soto) to rehabilitate the structure. At his deposition, Chadha was unable to recall when Soto applied for permits to perform the remodeling work but acknowledged that he received an e-mail from Soto stating that they applied for permits on August 30, 2010. Chadha testified that Soto did not perform any work on the Property because they were unable to obtain permits. Accordingly, Chadha terminated his contract with Soto.

¶ 8    On August 24, 2010, the housing court granted the City leave to file an amended complaint and ordered Chadha to schedule an inspection of the Property. The court also ordered Chadha to abate a rodent and pigeon infestation on the Property within seven days. The court

continued the case to October 12, 2010. At his deposition, Chadha testified that he did not contest the City's allegations in its complaint and did not have counsel in the housing court proceeding. Chadha acknowledged that he did not address any of the violations identified by the City in its complaint. On October 12, 2010, the housing court ordered Chadha to demolish the structure on the Property by December 2010. On November 8, 2010, Chadha voluntarily withdrew his permits to rehabilitate the structure and, through a letter addressed to the City, stated his intention to build a new construction home on the Property after the demolition. Chadha hired Permit Express to obtain demolition permits for the current structure and permits for the new construction he planned to build on the Property, which it successfully obtained. Chadha demolished the structure in December 2010 in accordance with the housing court's order. Chadha subsequently constructed a new home on the Property through Thang Construction. Chadha estimated the current value of the Property with the newly constructed structure to be $1.1 million.

¶ 9    Chadha alleged that, after his property was demolished, NPES filed suit against him alleging that he had intentionally allowed lead to contaminate the soil as a result of the demolition. NPES subsequently voluntarily dismissed the suit. On August 2, 2013, Chadha filed his initial complaint in the case at bar naming NPES as the sole defendant. In his complaint, Chadha alleged that, when Moulton approached him in an effort to purchase the Property, Moulton did not reveal that he was a member of the NPES board or that he was acting on the NPES board's behalf. Defendant raised claims for abuse of process against NPES for pursuing an unsubstantiated lawsuit against him because NPES had not submitted any evidence that he introduced lead into the ground as a result of the demolition.

¶ 10    On July 29, 2014, Chadha filed an amended complaint and added Lawrence, Moulton, Swan, Luna, and Ben Bowdon[1] as defendants. In his amended complaint, Chadha contended that Lawrence, Bowdon, Moulton, NPES, and its board, along with Swan and Luna, "engage[d] in a concerted effort to force Chadha to sell the [Property] and to have the same demolished so that NPES could acquire it for a planned expansion." Chadha asserted that the defendants carried out this arrangement by sending anonymous complaints, writing letters, and making phone calls to the City and the alderman. Chadha contended that the defendants' actions resulted in the issuance of multiple complaints filed by the City relating to building code violations. Chadha asserted that, "despite his stated efforts and intent with regard to the" Property, he was issued violations from the City "all due to complaints lodged by NPES staff members at [Lawrence] and [Bowdon's] direction, in concert with [Moulton] and the Alderman Schulter's office, working through [Luna], its then chief-of-staff." Chadha asserted that the actions taken by the defendants, including the City employees, were not done for a legitimate purpose but were for the sole purpose of coercing Chadha to sell his property to NPES.

¶ 11    Chadha attached to his complaint numerous e-mails between Lawrence, Moulton, the alderman's office, and other City employees that he obtained during discovery after filing his initial complaint. In reliance on the information contained in these e-mails, Chadha asserted claims for civil conspiracy, defamation *per se*, and tortious interference with expectancy. The thrust of Chadha's claims centered on the e-mails, which Chadha contended showed the collective efforts by the defendants to improperly put pressure on Chadha in order to help NPES acquire the Property for a price below market value. Chadha alleged that the defendants' tortious conduct, as demonstrated by the e-mails, affected the housing court proceeding, prevented him

---

[1]Chadha contended that Bowdon was a business manager of NPES.

from obtaining permits to repair the structure on the Property, and resulted in the ultimate demolition of the structure.

¶ 12    Chadha subsequently filed a second amended complaint on January 14, 2015. In his second amended complaint, Chadha added the City as a defendant but did not include Bowdon as a defendant. The second amended complaint again relied on the e-mails between Lawrence, NPES board members, Moulton, and the alderman's office in contending that the defendants engaged in a concerted effort to obtain the Property for NPES by pressuring Chadha through improper building code violations and the housing court proceeding. Chadha once again raised claims for civil conspiracy and defamation *per se* but added claims for tortious interference with contract, aiding and abetting, and violations of RICO.

¶ 13    The NPES Defendants filed a motion to dismiss the claims against them in Chadha's second amended complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2014)) for failure to state a claim. Separately, Swan also filed a motion pursuant to section 2-615 to dismiss the claims Chadha raised against it in his complaint. The circuit court denied the motions to dismiss Chadha's claims for tortious interference with contract and for civil conspiracy. However, the circuit court granted the defendants' motion with respect to Chadha's claims for defamation *per se* and the RICO violations.

¶ 14    Plaintiff filed a third amended complaint in which he restated his general allegations from the first and second amended complaints and restated his claims for civil conspiracy, defamation *per se*,[2] tortious interference with contract, violation of the federal RICO statute, and aiding and abetting.

---

[2]Chadha's defamation *per se* count was previously dismissed by the court and realleged by Chadha in his third amended complaint, but it is not at issue in this appeal.

¶ 15    The City Defendants filed a motion to dismiss Chadha's complaint pursuant to section 2-619(a)(9) of the Code (*id.* § 2-619(a)(9)) as untimely. The City Defendants contended that the action was time-barred based on the one-year statute of limitations in the Tort Immunity Act, which provides that "[n]o civil action *** may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101(a) (West 2014). The City Defendants pointed out that the conduct Chadha complained of occurred in 2010 and 2011, but Chadha did not file his initial complaint until August 2013, did not add Luna as a defendant until July 2014, and did not add the City until January 2015. Accordingly, the City Defendants asserted that Chadha's claims against them were time-barred and should be dismissed. The circuit court agreed with the City Defendants and granted their motion to dismiss the claims against them with prejudice.

¶ 16    The NPES Defendants also filed a motion to dismiss Chadha's third amended complaint pursuant to section 2-619(a)(9) of the Code (735 ILCS 5/2-619(a)(9) (West 2014)) and the Act, Illinois's anti-SLAPP (strategic lawsuits against public participation) litigation act. 735 ILCS 110/5 (West 2014). Swan joined the NPES Defendants' motion. In the motion, the NPES Defendants contended that Chadha's action was premised on activity protected by the Act; particularly the NPES Defendants' constitutionally protected rights to petition and participate in local government. The NPES Defendants contended that Chadha's lawsuit was intended to punish the NPES Defendants for contacting the alderman about the condition of Chadha's property, participating in the housing court proceeding, and encouraging other neighborhood citizens to contact the alderman about the Property. The NPES Defendants asserted that, under the Act, they are immune from liability for these actions regardless of their intent in participating

in these protected activities. The NPES Defendants contended that Chadha's complaint should therefore be dismissed with prejudice and the court should award them reasonable attorney fees and costs.

¶ 17    In ruling on the NPES Defendants' motion, the circuit court found that under the supreme court's ruling in *Sandholm v. Kuecker*, 2012 IL 111443, a party seeking dismissal under the Act must establish (1) that the conduct alleged in the complaint constitutes protected activity within the meaning of the CPA and (2) that the plaintiff's claims are solely based on or in response to protected activities; that is, the claims are "meritless [and] retaliatory." The court found that the NPES Defendants satisfied the first prong of the *Sandholm* test but failed to produce undisputed facts disproving an essential element of Chadha's cause of action. The court also found that the NPES Defendants had not established that Chadha filed the action with the intent to chill their constitutional rights. Rather, the court determined that, based on Chadha's claims in the complaint, he was seeking redress for harm he suffered as a result of the defendants' alleged tortious conduct. Accordingly, the circuit court denied the NPES Defendants and Swan's motion to dismiss the complaint pursuant to the Act.

¶ 18    The NPES Defendants and Swan filed an interlocutory appeal to review the court's order under Illinois Supreme Court Rule 306(a)(9) (eff. Jan 1, 2016). On November 17, 2016, this court denied their petition for leave to appeal. *Chadha v. North Park Elementary School Association*, No. 1-16-2804 (Nov. 17, 2016).

¶ 19    Following the circuit court's order denying the motion to dismiss, the parties filed cross-motions for summary judgment on all of Chadha's remaining claims. In ruling on the motions, the court found that it did not matter what information defendants supplied to the City before or during the housing court proceeding. "Assuming every bad thing [Chadha] suggests is true, the

- 9 -

inescapable fact remains that when [Chadha] was confronted with the City's claim that 'the Property needed to be demolished, he *acquiesced*.' " (Emphasis added.) The court determined that, by not contesting it, he "effectively agreed" to the demolition, which was "fatal" to his claims because it showed that the defendants did not cause a "sham" demolition action.

¶ 20 The court further found that Chadha's summary judgment brief represented an impermissible collateral attack on the housing court's demolition order. The court stated that if Chadha thought the demolition order was erroneous, he should have moved for reconsideration or appealed the order, but he did neither. The court found that, instead, Chadha acquiesced in the demolition and, therefore, caused his own injury. Accordingly, the court found that Chadha could not prevail on his claim for tortious interference with contract as a matter of law. In addition, the court determined that Chadha's remaining claims for civil conspiracy and aiding and abetting were not independent torts but required underlying tortious conduct, which was not present in this case. Thus, the court found that Chadha could not prevail on any of his remaining claims. As such, the court granted summary judgment in favor of defendants and denied Chadha's motion. Chadha now appeals.

¶ 21                                                    II. ANALYSIS

¶ 22                                          A. Chadha's Appeal

¶ 23 We first address the claims raised by Chadha in his appeal. On appeal, Chadha contends that the circuit court erred in dismissing his claim for a violation of the federal RICO statute, the court erred in dismissing the City Defendants under the Tort Immunity Act, and the court erred in granting defendants' motion for summary judgment. Chadha asserts that he presented unrebutted evidence of defendants' tortious conduct through their own writings and admissions

and the circuit court improperly construed his arguments as a collateral attack on the housing court's demolition order.

¶ 24                                  1. *Chadha's RICO Claim*

¶ 25     Chadha first contends that the court erred in dismissing his claim for a violation of the federal RICO statute directed against all defendants. Chadha first raised this claim in his second amended complaint, and after it was dismissed by the circuit court, he restated the claim in his third amended complaint for purposes of preserving the claim for appeal.

¶ 26                                  a. Standard of Review

¶ 27     The circuit court granted the NPES Defendants and Swan's motions to dismiss Chadha's claim for a violation of the RICO statute pursuant to section 2-615 of the Code. A section 2-615 motion to dismiss attacks the legal sufficiency of a claim based on defects apparent on its face. *Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 2012 IL 112479, ¶ 15. A section 2-615 motion to dismiss "presents the question of whether the facts alleged in the complaint, viewed in the light most favorable to the plaintiff, and taking all well-pleaded facts and all reasonable inferences that may be drawn from those facts as true, are sufficient to state a cause of action upon which relief may be granted." *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 25 (citing *Doe-3*, 2012 IL 112479, ¶ 16). A court should dismiss a claim pursuant to section 2-615 only where it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). We review the court's ruling on a section 2-615 motion to dismiss *de novo*. *Doe-3*, 2012 IL 112479, ¶ 15.

¶ 28                                  b. Elements of a RICO Claim

¶ 29    "In order to assert a civil claim for violations of [section 1962(c) of] the RICO Act, a plaintiff must allege that (1) the defendants participated in the operation or management (2) of an enterprise (3) through a pattern (4) of racketeering activity." (Internal quotation marks omitted.) *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶ 19 (quoting *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 351-52 (2000)). "An 'enterprise' is an entity composed of a group of persons associated together for a common purpose," and it "must be an ongoing entity or association that is distinct from the alleged pattern of racketeering activity." (Internal quotation marks omitted.) *Id.* (quoting *Rodgers*, 315 Ill. App. 3d at 352). "[R]acketeering activity" includes so-called predicate acts, including mail fraud, extortion, and wire fraud, which are alleged in the case at bar. 18 U.S.C. § 1961(1) (2012); *Pankros v. Tyler*, 401 Ill. App. 3d 936, 943 (2010). In order to state a cause of action for a RICO claim, a plaintiff may not simply allege these elements in a boilerplate fashion, but must allege sufficient facts to support each element. *Merrilees*, 2013 IL App (1st) 121897, ¶ 19 (citing *Goren v. New Vision International, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998)).

¶ 30                                    i. *Enterprise*

¶ 31    In order to properly state a cause of action for a RICO claim, Chadha was first required to allege sufficient facts to show that defendants were involved in an enterprise. A RICO enterprise " 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.' " *Wallace Acquisitions, Inc. v. Allied Waste Industries, Inc.*, 304 Ill. App. 3d 1009, 1016 (1999) (quoting 18 U.S.C. § 1961(4) (1994)). "The central element of an enterprise is an ongoing structure or persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." (Internal quotation marks omitted.) (*Wallace*, 304

Ill. App. 3d at 1016 (quoting *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995)). The enterprise must be an ongoing entity or association that is distinct from the alleged pattern of racketeering activity. *Merrilees*, 2013 IL App (1st) 121897, ¶ 19 (citing *Rodgers*, 315 Ill. App. 3d at 352).

¶ 32    In his complaint, Chadha alleged that "NPES is an enterprise and the Defendants did conduct the affairs of this enterprise through a pattern of racketeering." Chadha also alleged that each of the defendants "had some part in directing the enterprise's affairs." Chadha's allegation that the defendants are an enterprise fails for two reasons. First, Chadha fails to introduce any factual support for this element but merely offers the conclusory claim that the defendants are an "enterprise." Chadha contends that the e-mails attached to his complaint demonstrate that the defendants were associated for a common purpose and "an ongoing entity or association," but the e-mails merely show communication between the defendants and do not show that defendants were organized in a manner amenable to hierarchical or consensual decision-making. Chadha also vaguely refers to an "agreement" among defendants, presumably to assist NPES in acquiring the Property, but such a contention, without sufficient factual support, cannot serve as a basis for this claim, and no such agreement is readily apparent from the e-mails themselves.

¶ 33    Secondly, Chadha failed to plead facts showing that the alleged enterprise was an ongoing entity that was *distinct* from the alleged pattern of racketeering activity. Chadha alleged that the defendants formed this association in order to obtain the Property through a pattern of racketeering activity but provides no factual support to show that defendants were an " 'ongoing entity or association *** distinct from the alleged pattern of racketeering activity.' " *Id.* (quoting *Rodgers*, 315 Ill. App. 3d at 352). Chadha fails to identify any ongoing association or relationship between the City, Luna, NPES, Swan, Lawrence, and Moulton independent from the

alleged racketeering activity. Thus, Chadha failed to sufficiently plead the enterprise element of his RICO claim.

¶ 34                                    ii. *Pattern*

¶ 35    Chadha also failed to plead facts showing a pattern of racketeering activity. A pattern of racketeering activity requires at least two predicate acts of racketeering committed within a 10-year period. 18 USC § 1961(5) (2012). "Predicate acts alone, however, do not make a pattern; in order to establish a RICO pattern, 'it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity.' " (Emphasis in original.) *Merrilees*, 2013 IL App (1st) 121897, ¶ 20 (quoting *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 240 (1989)). Continuity can be either closed-ended or open-ended.

> "Closed-ended continuity *** refers to criminal behavior that has come to a close but endured for such a substantial period of time that the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future. [Citation]. Open-ended continuity refers to a course of criminal activity that lacks the duration and repetition to establish continuity but where the past conduct by its nature projects into the future with a threat of repetition." (Internal quotation marks omitted.) *Id.* (citing *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 473 (7th Cir. 2007)).

¶ 36    Here, Chadha failed to establish either closed-ended or open-ended continuity. All of the conduct Chadha complained of occurred before the housing court ordered the demolition of his house. Chadha raised no allegations any defendant engaged in any alleged racketeering activity after the structure on the Property was demolished and he constructed a new home or that he was concerned about future racketeering activity from these defendants. His allegations thus lacked

the threat of repetition or threat of future criminal activity necessary to show a pattern of racketeering activity necessary to support a RICO claim.

¶ 37                                     iii. *Racketeering Activity*

¶ 38    Chadha also failed to plead facts showing defendants committed any predicate acts that constituted racketeering activity. Section 1961(1) of the United States Code lists a series of predicate offenses that constitute racketeering activity. 18 U.S.C. § 1961(1) (2012). That section lists acts or threats punishable by state law, including murder, kidnapping, arson, and extortion, as well as specifically enumerated federal law offenses such as mail fraud (18 U.S.C. § 1341 (2006)) and wire fraud (18 U.S.C. § 1343 (2006)), which Chadha alleged in this case.

¶ 39    In his complaint, Chadha listed 25 different occurrences that he contended constituted predicate acts for purposes of his RICO claim. Chadha asserted that these acts constituted mail fraud, wire fraud, extortion and/or acts of intimidation under section 12-6 of the Criminal Code of 1961 (720 ILCS 5/12-6 (West 2010)). The majority of Chadha's claims were based on e-mails exchanged among the defendants. For instance, in one allegation, Chadha contended that he had previously approached Lawrence regarding NPES purchasing his property. Lawrence indicated to Chadha in an e-mail that NPES was not interested in purchasing the Property. Chadha contended, however, that despite Lawrence's representation to him, NPES was interested in purchasing the Property, and the defendants "began to engage in concerted efforts and schemed to take steps that would have the effect of coercing Chadha to sell the Property, through the following action: acting t[o] restrict Chadha's ability to make repairs and obtain permits, through false offers of purchase for 'interested buyers' that were fabricated, through written threats and suggestions that he will lose the Property."

¶ 40 Similarly, in a separate allegation, Chadha contended that defendants "commenced a series of 'neighborhood nuisance' complaints [ ] against the Property, which resulted in the issuance of multiple complaints filed by the City of Chicago against the Property." Chadha also identified an e-mail Lawrence sent to the NPES board about Chadha's housing court proceeding. In the e-mail, Lawrence informed the board that Luna attended the court date as well as four people from the neighborhood and that an inspector would be visiting the Property to check on the status of the violations assessed against the Property. Essentially, each of the predicate acts identified by Chadha are communications between Lawrence, the NPES board, Moulton, the alderman's office, the City, and himself regarding the Property, NPES's desire to acquire the Property, the housing court proceeding, and the various violations assessed against the Property by the City.

¶ 41 Despite Chadha's contentions to the contrary, the e-mails merely show the NPES Defendants' desire to purchase the Property and their concern about the condition of the structure on Chadha's property. Lawrence communicated these concerns to the City and the alderman, which resulted in citations being issued against Chadha and the Property. Crucially, Chadha did not contend in the housing court proceeding, before the circuit court, or before this court that these citations were wrongfully assessed or otherwise improper. Instead, he acknowledged the poor condition of the Property but nonetheless asserted that the defendants somehow violated the law by communicating their concerns about Chadha's property to the City and the alderman. In fact, as the circuit court implicitly recognized, none of defendants' conduct identified by Chadha is unlawful despite Chadha's conclusory allegations that the conduct constituted acts of intimidation, attempted extortion, mail fraud, and wire fraud. The NPES Defendants do not deny that they sought to purchase Chadha's property and made several offers to Chadha for the

purchase of the Property. The NPES Defendants also do not deny that they contacted the City and alderman regarding the state of Chadha's property believing it to be a safety concern. Neither NPES nor Moulton denies that Moulton contacted Chadha through Swan on behalf of NPES in an attempt to purchase the Property without revealing that his "client" was NPES. Chadha represents these facts as unquestionably illegal activity without even attempting to show how defendants' actions violated the statutes he alleges. Instead, his allegations merely cite to the e-mails attached to his brief, and he summarily concludes that defendants must have violated the law. Such baseless allegations cannot serve as the basis for a RICO claim. The thrust of Chadha's allegations seem to suggest that the e-mails speak for themselves, but contrary to his arguments before the circuit court and in his brief before this court, the complained-of conduct does not amount to illegal activity that would constitute a predicate act under RICO. In essence, Chadha's allegations seem to be merely that the communications took place, but the communications themselves are not sufficient to support his claim, and an independent review of the communications attached to his complaint does not reveal actionable conduct. Thus, as the circuit court recognized, Chadha's failure to present a sufficient factual basis to show how defendants' activities constituted "racketeering activity" is fatal to his claim.

¶ 42                                    iv. *Conclusion*

¶ 43    In short, Chadha has failed to allege sufficient factual support for any element of his RICO claim. Even assuming some of the conduct alleged by Chadha did constitute criminal activity, we would still find that the circuit court properly dismissed this count from his complaint. As this court has recognized, congress enacted RICO "in an attempt to eradicate organized, long-term criminal activity." (Internal quotation marks omitted.) *Merrilees*, 2013 IL App (1st) 121897, ¶ 18 (quoting *Zinser v. Rose*, 245 Ill. App. 3d 881, 885 (1993)). RICO was

" 'never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions,' " as Chadha attempts to do here. *Id.* (quoting *Jennings*, 495 F.3d at 472). Accordingly, we find that the circuit court properly granted the NPES Defendants and Swan's motion to dismiss this claim.

¶ 44                    2. *Tort Immunity Act Statute of Limitations*

¶ 45    We next address Chadha's claim that the circuit court improperly dismissed his claims against the City Defendants based on the Tort Immunity Act statute of limitations. The Tort Immunity Act provides that "[n]o civil action *** may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101(a) (West 2014). In this case, Chadha's contentions are focused on conduct that occurred in 2010 and 2011. Chadha filed his initial complaint against NPES in August 2013, added Luna as a defendant in July 2014, and added the City in January 2015.

¶ 46    Chadha acknowledges that the Tort Immunity Act's one-year statute of limitations applies to his claims against the City Defendants but contends that his claims are nevertheless timely because the discovery rule applies to his claims. Chadha asserts that he did not know about the City Defendants' communications with NPES regarding NPES's desire to acquire the Property until he received the e-mails in discovery in January 2014 and he added both City Defendants to the cause of action within one year of that discovery. Chadha contends that the court thus erred in granting the City Defendants' motion where Chadha discovered his claims against the City Defendants less than one year before adding them as defendants.

¶ 47                    a. The Discovery Rule

¶ 48 The discovery rule "delays the commencement of the relevant statute of limitations until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." (Internal quotation marks omitted.) *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 77 (1995) (quoting *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill. 2d 240, 249 (1994)). Knowledge that an injury has been wrongfully caused "does not mean knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of action," and thus the statute of limitations may run despite the lack of actual knowledge of wrongful conduct. (Internal quotation marks omitted.) *Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, ¶ 13 (citing *SK Partners I, LP v. Metro Consultants, Inc.*, 408 Ill. App. 3d 127, 130 (2011), *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 673 (1997)). The rule protects a plaintiff only until he knows or reasonably should know of the injury, not until he has actual knowledge. *PSI Resources, LLC v. MB Financial Bank, National Ass'n*, 2016 IL App (1st) 152204, ¶ 44 (citing *Gale v. Williams*, 299 Ill. App. 3d 381, 387 (1998)). "A person knows or reasonably should know an injury is 'wrongfully caused' when he or she possesses sufficient information concerning an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct had occurred." *Janousek*, 2015 IL App (1st) 142989, ¶ 13 (citing *Hoffman v. Orthopedic Systems, Inc.*, 327 Ill. App. 3d 1004, 1011 (2002)). Generally, whether an action was brought within the time allowed by the discovery rule is a question of fact. *PSI Resources*, 2016 IL App (1st) 152204, ¶ 44. We may determine the question as a matter of law, however, where the answer is clear from the pleadings. *Id.*

¶ 49 b. Discovery Rule Does Not Toll Limitations Period in this Case

¶ 50    In this case, Chadha contends that the discovery rule tolls the limitations period because he did not know about the communication between NPES and Moulton and the City regarding NPES's desire to acquire the Property until he received the e-mails through discovery in January 2014. In his third amended complaint, however, Chadha alleged that between May 14 and May 20, 2010, he received a text message from Moulton in which he indicated that the alderman's office said that there would be more violations issued for the Property. Chadha also alleged that in 2010, the City, with the aid of defendants, "commenced a series of 'neighborhood nuisance' complaints" against the Property. Chadha alleged that these complaints required him to borrow funds and incur greater expense in attempting to rehabilitate his home. He further alleged that despite his efforts and intent to rehabilitate the Property, the City issued him more violations. Chadha alleged that staff at the alderman's office exceeded their authority when they attended his housing court proceeding on two separate "furlough days." Chadha alleged that Luna was one of the employees who attended court and supported the demolition "as a representative of the Alderman's office." Chadha also alleged that the City's housing court complaint did not show dangerous or hazardous conditions that could not be repaired and none of the alleged code violations required demolition of the structure on the Property.

¶ 51    Based on the contentions in his complaint, it is clear that Chadha had enough information in 2010 or 2011 to put him on notice that there was an injury or that the injury may have been wrongfully caused by the City Defendants. *Dancor*, 288 Ill. App. 3d at 674. In this case, the injury is the demolition of the structure on the Property and the subsequent expenditure Chadha incurred in constructing a new structure on the Property. By Chadha's own admissions he believed that the City's allegations in the housing court proceeding did not merit demolition, and he noted the unusual participation in the proceedings by City employees, including Luna.

Chadha also knew in 2010 that Moulton was connected to NPES, that NPES wanted to purchase the Property, and that Moulton had been in contact with the alderman's office. Although Chadha did not have "actual knowledge" that his injury was wrongfully caused or the extent of the City Defendants' involvement, based on the information available to him at the time, he had sufficient information to make a reasonable inquiry to determine whether actionable conduct had occurred. *Janousek*, 2015 IL App (1st) 142989, ¶ 13.

¶ 52    It is clear from Chadha's second and third amended complaints that his allegations are based in part on the same information he knew in 2010 regarding the City Defendants' involvement in the housing court proceeding. Chadha's injury has always been the demolition, and if Chadha believed that injury to be wrongfully caused when it occurred, he knew of the City's involvement at the time of the demolition. Although those allegations are now supported by communications he obtained in January 2014, it is clear that, in 2010, Chadha possessed sufficient knowledge to put him on notice of the City Defendants' possible contribution to his injury. Accordingly, the statute of limitations began to run at the latest in December 2010 when he demolished his home pursuant to the housing court order or in 2011 when he incurred expenses in the construction of a new structure on the Property. At that time, his injury was realized, and he had sufficient information to put him on reasonable notice of the City Defendants' involvement to require him to inquire further. Thus, the Tort Immunity Act's one-year statute of limitations began to run at that time and expired before Luna was added to the cause of action on July 29, 2014, and before the City was added as a defendant on January 14, 2015. We therefore find that the court did not err in granting the City Defendants' motion to dismiss the claims against them in Chadha's complaint.

¶ 53                    3. *Chadha's Claims on Summary Judgment*

¶ 54    We now address Chadha's remaining claims on summary judgment. After dismissing Chadha's RICO claim and dismissing the City Defendants from the cause of action, Chadha's remaining claims were (1) civil conspiracy against the NPES Defendants, (2) tortious interference with contract against the NPES Defendants and Swan, and (3) aiding and abetting against the NPES Defendants and Swan. After discovery, the NPES Defendants and Swan filed separate motions for summary judgment on all of Chadha's remaining claims. Chadha filed a cross-motion for summary judgment on his claims. In a written order, the circuit court granted NPES Defendants' and Swan's motions and denied Chadha's cross-motion.

¶ 55                               a. Standard of Review

¶ 56    A court should grant summary judgment only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2014); *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). "When parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Although a plaintiff is not required to prove his case at the summary judgment stage, he must present sufficient evidence to create a genuine issue of material fact to defeat a defendant's motion for summary judgment. *Keating v. 68th & Paxton, L.L.C*, 401 Ill. App. 3d 456, 470 (2010). We review an order granting a motion for summary judgment *de novo*. *Adams*, 211 Ill. 2d at 43.

¶ 57                           c. Tortious Interference with Contract

¶ 58    We first address Chadha's claim for tortious interference with contract. As the circuit court recognized, Chadha's other claims for civil conspiracy and aiding and abetting are not

independent torts, *i.e.*, they both require underlying conduct that is tortious. *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 59 (civil conspiracy); *Reuben H. Donnelley Corp. v. Brauer*, 275 Ill. App. 3d 300, 310 (1995) (aiding and abetting). In this case, Chadha's claims for civil conspiracy and aiding and abetting are premised on his claim for tortious interference with contract, that is, that defendants' underlying conduct was tortious. Thus, as the circuit court found, if Chadha cannot prevail on his claim for tortious interference with contract, then his remaining claims must necessarily fail as a matter of law.

¶ 59                                                    i. *Elements*

¶ 60    In order to prevail on a claim for tortious interference with contract, a plaintiff must plead and prove

> "(1) the existence of a valid and enforceable contract between the plaintiff and another;
> (2) the defendant's awareness of the contractual relationship between the plaintiff and
> another; (3) the defendant's intentional and unjustifiable inducement of a breach of
> the contract; (4) a breach of contract by the other caused by the defendant's wrongful
> acts; and (5) damage to the plaintiff." *Cress v. Recreation Services, Inc.*, 341 Ill. App. 3d
> 149, 175 (2003) (citing *Grund v. Donegan*, 298 Ill. App. 3d 1034, 1038 (1998)).

¶ 61                           ii. *Allegations in Chadha's Complaint*

¶ 62    In his tortious interference with contract count, Chadha alleged that the NPES Defendants were communicating with the City Defendants in an attempt to "fast track" the housing court proceeding so that Chadha did not have an adequate opportunity to repair the Property. Chadha contended that all of the defendants knew he had entered into a contract for the rehabilitation of the Property and had obtained a permit for the rehabilitation. Chadha asserted that "[d]efendants specifically knew that Chadha intended to fully rehab and bring the [ ] Property into full

compliance with the building and any related municipal codes, and that he was willing to do so," but defendants told City employees that Chadha was " 'incompetent to rehab the [P]roperty' and that the contractors were doing poor work and that they were 'concerned about building code violations.' "

¶ 63    Chadha contended that defendants "intentionally interfered" with his contracts with Soto and Permit Express by "seeking out aldermanic and political assistance" and urging other people in the neighborhood to attend the housing court proceeding and speak out about the condition of the Property. Chadha alleged that these efforts by defendants interfered with his ability to rehabilitate the Property because it coerced the housing court and the alderman's office to push for demolition of the Property and made the rehabilitation efforts appear impossible "(although it was not)." Chadha contended that the defendants also put pressure on him by telling him that the Property would be foreclosed or taken by the City. Chadha asserted that these "actions contributed toward a frustration and eventually a termination of Chadha's reasonable expectancy" of rehabilitating the Property and that he was forced to build a new structure on the Property after the demolition. Chadha asserted that his damages exceeded "well over $300,000 and can be proven up at trial."

¶ 64                                        iii. *The Circuit Court's Ruling*

¶ 65    In granting defendants' motions for summary judgment, the circuit court determined that, in order for Chadha to prevail on his tortious interference with contract claim, he had to be able to prove that the housing court's demolition order was entered as a result of defendants' wrongful conduct. The court found that Chadha had not introduced any admissible evidence to support his claim that defendants interfered with his building permit application and prevented him from rehabilitating the Property. The court noted that Chadha's permit application was never

denied, but he voluntarily withdrew it. The court determined that it was irrelevant what information defendants provided to the City before or during the housing court proceeding. "Assuming every bad thing Plaintiff suggests is true, the inescapable fact remains that when Plaintiff was confronted with the City's claim that 'the Property needed to be demolished, he *acquiesced*.'" (Emphasis added.) The court noted that Chadha acknowledged that he did not contest the allegations in the City's demolition complaint and effectively agreed to the demolition. The court found that this was fatal to his claim because it foreclosed any argument that defendants caused the City to initiate a "'sham' or baseless demolition action."

¶ 66 The court also determined that Chadha's summary judgment brief represented a challenge to the legality of the housing court's demolition order, which was an impermissible collateral attack on that judgment. The court stated that, if Chadha sought to challenge that order, he could have appealed from it or filed a section 2-1401 petition for relief from judgment (735 ILCS 5/2-1401 (West 2014)). The court found that because Chadha acquiesced in the demolition, he in effect caused his own injury and could not prevail on his claim for tortious interference with contract as a matter of law. The court further found that he therefore could not prevail on his remaining claims for civil conspiracy and aiding and abetting. Accordingly, the court found that Chadha could not prevail on any of his claims as a matter of law, granted summary judgment in favor of defendants, and denied Chadha's cross-motion for summary judgment.

¶ 67 iv. *The Circuit Court Properly Granted Summary Judgment*

¶ 68 In his brief before this court, Chadha contends that the circuit court erred in finding that his tortious interference claim was determined by the outcome of the housing court proceeding. Chadha asserts that the "sole reason" the circuit court could not provide the relief he requested was because he did not appeal or attempt to vacate the demolition order. Chadha contends that

this finding was in error because he showed defendants' tortious conduct irrespective of the outcome of the housing court proceeding. Chadha asserts that he demonstrated defendants' tortious interference through the NPES Defendants' communications with the City where it sought violations against Chadha's property, Moulton's attempts to purchase his home on NPES's behalf without revealing that he was acting on behalf of NPES, and Lawrence's e-mails to neighbors encouraging them to attend the housing court proceeding.

¶ 69    Initially, we observe that Chadha dedicates much of his brief to challenging the circuit court's determination that his summary judgment brief represented an impermissible collateral attack on the housing court's demolition order. Despite Chadha's contentions, this finding was not the "sole" reason the court granted summary judgment in favor of defendants. Rather, the court had already found that Chadha could not prevail on his tortious interference with contract claim before stating that his summary judgment brief amounted to an impermissible collateral attack on the housing court's judgment. Because we affirm the circuit court's judgment that Chadha cannot prevail on this claim as a matter of law, we express no opinion regarding whether his summary judgment brief represented an impermissible collateral attack.

¶ 70    Chadha also disagrees with the circuit court's conclusion that he could only prevail on his tortious interference with contract claim if he could prove that the housing court's demolition order was entered as a result of defendants' wrongful conduct. However, as the circuit court recognized, this is the crux of Chadha's claim, as the defendants' conduct could only be tortious if the violations levied against Chadha's property were meritless and the demolition was ultimately unwarranted and occurred only as a result of defendants' tortious conduct.

¶ 71    The circuit court was also correct in finding that Chadha had failed to establish the other elements required for a tortious interference with contract claim. The crucial elements here, as

identified by the circuit court, are whether defendants intentionally and unjustifiably induced a breach of the contract and whether the breach of contract by the third party was caused by the defendants' wrongful acts. In this case, Chadha's claims were centered around his contract with Soto to rehabilitate the structure on the Property. Although Chadha never alleged that Soto breached that contract, his allegations seem to suggest that defendant's wrongful conduct caused performance of the contract to be impossible, thus requiring him to terminate the contract. Although our analysis of this issue could stop at this juncture, as Chadha has failed to demonstrate, or even allege, an essential element of this claim, *i.e.*, breach of the contract,[3] we will nonetheless address Chadha's remaining claims on this issue.

¶ 72    Chadha contends that defendants' actions rendered performance of the contract impossible in two ways. First, Chadha alleges that defendants' wrongful actions made it impossible for him to acquire permits for the rehabilitation. Second, Chadha asserts that, after the housing court ordered the demolition, any rehabilitation efforts became worthless and he had no choice but to cancel the contract with Soto. With regard to the first allegation, Chadha has failed to demonstrate that he would otherwise have been entitled to the permits absent defendants' conduct or that his rehabilitation efforts would have forestalled the demolition. Chadha has not introduced into evidence the permit applications themselves or any credible evidence suggesting that, absent defendants' alleged conduct, the permit applications would have been approved and Soto could have performed on the contract. In fact, the record shows that after retaining Permit Express, Chadha subsequently filed new permit applications, which were approved without issue.

---

[3]In fact, the record shows that Chadha voluntarily withdrew his permit applications and chose to terminate Soto because he wanted to "start fresh."

¶ 73    Similarly, with regard to Chadha's second allegation, Chadha has once again failed to demonstrate that, absent defendants' alleged conduct, the housing court would not have ordered the demolition. At no point in his pleadings before the circuit court or in his brief before this court does Chadha assert that any of the building code violations issued against the Property were improper. Nor does he contest any of the allegations in the City's housing court complaint. Chadha, however, asserts that "[d]efendants did not submit proofs as to what was said in [the housing court proceeding], what actions any party took prior to the demolition order, and they submitted exactly zero proof of testimony from any party that established what came before that order." We first note that this contention is contradicted by the record. In his deposition, Chadha acknowledged that he did not contest the City's allegations and did not retain a lawyer to represent him in the housing court proceeding. Chadha speculated that, if he had retained a lawyer, the structure on the Property might not have been demolished. The record also includes various filings by the City in the housing court against Chadha, which, again, are uncontested. Instead of presenting contradictory factual evidence, however, Chadha relies on conclusory arguments such as "the acts of the Defendants were tortious because singly or taken together, a series of things were done and said as alleged in the Third [Amended] Complaint which were proven."

¶ 74    Secondly, this argument by Chadha represents a misunderstanding of the burden of proof. Defendants were not required to prove the inverse of Chadha's claims. Rather, the burden was on Chadha to show that the housing court's demolition order was entered only because of defendants' wrongful conduct and, in fact, would not have been entered in the absence of defendants' wrongful conduct. As the circuit court recognized, "[a]ssuming every bad thing Plaintiff suggests is true, the inescapable fact remains that when Plaintiff was confronted with

the City's claim that 'the Property needed to be demolished, he acquiesced.' " (Emphasis omitted.) As Chadha's own allegations recognized, it was the demolition that ultimately rendered performance of his contract with Soto impossible, and thus in order to prevail on his claim, he was required to show that the demolition was improperly ordered as a result of defendants' wrongful conduct. He has failed to do so, and thus, we find that the circuit court properly granted summary judgment in favor of defendants on this claim.

¶ 75                                     v. *Conclusion*

¶ 76    As stated, because we find that Chadha cannot prevail on his claim for tortious interference with contract, his other claims for civil conspiracy and aiding and abetting must also fail. Accordingly, we find that the circuit court properly granted summary judgment in favor of defendants and denied Chadha's cross-motion for summary judgment.

¶ 77                          B. NPES Defendants and Swan Cross-Appeal

¶ 78    Finally, we will address the NPES Defendants and Swan's[4] contentions on cross-appeal. In their cross-appeal, the NPES Defendants contend that the circuit court erred in denying their motion to dismiss Chadha's complaint pursuant to the Act. In challenging the circuit court's judgment, the NPES Defendants assert that Chadha failed to demonstrate that his lawsuit was not meritless and not brought to retaliate against the NPES Defendants for participating in conduct protected under the Act. The NPES Defendants maintain that the circuit court misapplied the relevant standard as interpreted by the Illinois Supreme Court in *Sandholm*, 2012 IL 111443, by placing the burden on them to show that the lawsuit was meritless and retaliatory, where the burden should have been on Chadha to show that the suit did not violate the Act.

---

[4]Swan adopted the NPES Defendants arguments on cross-appeal without advancing any additional argument. Accordingly, for the sake of clarity, we will refer to the contentions as being raised by the NPES Defendants while recognizing that Swan also joined in the argument.

¶ 79                                    1. *Jurisdiction*

¶ 80    We initially note that we have jurisdiction to consider this issue. The record shows that the circuit court entered an order denying the NPES Defendants' motion to dismiss on September 23, 2016. Within 30 days of that order, the NPES Defendants filed a petition for leave to appeal pursuant to Illinois Supreme Court Rule 306(a)(9) (eff. Jan. 1, 2016). This court denied the NPES Defendants leave to appeal that order. *Chadha v. North Park Elementary School Association*, No. 1-16-2804 (Nov. 17, 2016). After the circuit court's final judgment in this case, Chadha filed his notice of appeal within 30 days, and the NPES Defendants filed their notice of cross-appeal within 10 days of Chadha's notice of appeal. Ill. S. Ct. R. 303(a)(3) (eff. Jan. 1, 2015). It is well settled that

> "an appeal from a final judgment draws into issue all prior interlocutory orders which produced the final judgment. [Citation.] That is to say, we have jurisdiction to review interlocutory orders of a trial court if those orders constitute a procedural step in the progression leading to the entry of the final judgment from which an appeal has been taken." *Valdovinos v. Luna-Manalac Medical Center, Ltd.*, 307 Ill. App. 3d 528, 538 (1999) (citing *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 433 (1979); *Hough v. Kalousek*, 279 Ill. App. 3d 855, 863-64 (1996)).

Accordingly, we find that we have jurisdiction to consider the NPES Defendants' arguments.

¶ 81                                    2. *The Act*

¶ 82    The Act was enacted in 2007 as Illinois's anti-SLAPP litigation act. 735 ILCS 110/5 (West 2014). SLAPP lawsuits are "lawsuits aimed at preventing citizens from exercising their political rights or punishing those who have done so." (Internal quotation marks omitted.) *Sandholm*, 2012 IL 111443, ¶ 33. The Act provides that "[a]cts in furtherance of the

constitutional rights to petition, speech, association, and participation in government are immune from liability, regardless of intent or purpose, except when not genuinely aimed at procuring favorable government action, result, or outcome." 735 ILCS 110/15 (West 2014). The Act provides for summary dismissal, expedited appellate review, and recovery of attorney fees for the "SLAPPed" party. *Sandholm*, 2012 IL 111443, ¶ 35.

¶ 83    In determining whether a lawsuit may be dismissed under the Act, the court engages in a three-part analysis. *Id.* ¶¶ 53-57. Under the Act, a defendant may move "to dispose of a claim in a judicial proceeding" on (1) the grounds that he engaged in an act "in furtherance of [his] rights of petition, speech, association, or to otherwise participate in government" and (2) the plaintiff's claim "is based on, relates to, or is in response to" that protected act of citizen participation. 735 ILCS 110/15 (West 2014). The burden then shifts to the plaintiff to produce (3) "clear and convincing evidence" that the acts of the moving party were a sham, *i.e.*, that they were "not genuinely aimed at procuring favorable government action." *Id.* §§ 15, 20(c). A motion for dismissal under the Act is brought under section 2-619(a)(9) of the Code and our review is *de novo*. *Sandholm*, 2012 IL 111443, ¶ 55.

¶ 84         a. Whether Defendants' Acts Were in Furtherance of Political Rights

¶ 85    Here, the NPES Defendants assert that the conduct Chadha identifies in his complaint was protected conduct under the Act. In his response brief, Chadha does not directly contest this contention, but instead focuses on whether the NPES Defendants had adequately proved that his lawsuit was meritless and retaliatory. We agree with the NPES Defendants and the circuit court that their conduct of contacting the alderman and the City regarding Chadha's property was an act of government participation clearly protected by the Act.

¶ 86         b. Whether Chadha's Suit Was Meritless and Retaliatory

¶ 87    The second prong of our analysis requires us to consider whether the NPES Defendants established that Chadha's lawsuit was "solely based on" the NPES Defendants' exercises of their political rights. (Internal quotation marks omitted.) *Goral v. Kulys*, 2014 IL App (1st) 133236, ¶ 38. In order to establish this element, the NPES Defendants must show that Chadha's suit "is meritless and was filed in retaliation against [their] protected activities in order to deter [them] from further engaging in those activities." (Internal quotation marks omitted.) *Id.* (quoting *Garrido v. Arena*, 2013 IL App (1st) 120466, ¶ 18).

¶ 88    In denying the NPES Defendants' motion to dismiss under the Act, the circuit court, relying on *Sandholm* and *Goral*, found that the NPES Defendants failed to establish that Chadha's claims were meritless and retaliatory. The court found that the NPES Defendants had failed to "come forward with undisputed facts disproving an essential element of [Chadha's] causes of action." The court also found that the NPES Defendants did not establish that Chadha brought the action for the sole purpose of "chill[ing]" the NPES Defendants' constitutional rights. Rather, the court found that based on the allegations in Chadha's complaint, he was seeking redress for the harm he suffered as a result of the NPES Defendants' alleged wrongful conduct. The court found that the timing of Chadha's suit weighed in his favor with regard to this factor because he did not file his suit while the NPES Defendants were engaged in the exercise of their protected rights but filed the suit only after the structure on the Property was demolished and after the NPES Defendants engaged in the allegedly tortious conduct.

¶ 89    In their arguments before this court, the NPES Defendants assert that the circuit court misapplied the standard in *Sandholm* and *Goral*, which had the effect of placing an unreasonably high burden on them to affirmatively defeat Chadha's claim. The NPES Defendants contend that such a construction "effectively guts" the Act and renders the act superfluous to the avenues of

relief already provided for in section 2-619 of the Code. The NPES Defendants contend that under the Act and *Sandholm*, the burden is on defendant only to show that he engaged in activity protected by the Act but then the burden should shift to the plaintiff to show that his lawsuit is not meritless and retaliatory and, thus, does not violate the Act. The NPES Defendants contend that the court erred in flipping the burden of proof to defendants. The NPES Defendants nonetheless contend that, even under the standard applied the circuit court, they met their burden to show that Chadha's claim was meritless and retaliatory.

¶ 90                                   i. *Burden Shifting Under the Act*

¶ 91     The text of the Act provides that once the defendant establishes that plaintiff's complaint is based on or in response to defendant's protected rights, the burden then shifts to the responding party to produce "clear and convincing evidence that the acts of the moving party are not immunized from, or are not in furtherance of acts immunized from, liability" under the Act. *Sandholm*, 2012 IL 111443, ¶ 56 (citing 735 ILCS 110/15, 20 (West 2008)). Thus, as the supreme court explained in *Sandholm*,

> "defendants had the initial burden of proving that plaintiff's lawsuit was solely 'based on, relate[d] to, or in response to' their acts in furtherance of their rights of petition, speech or association, or to participate in government. Only if defendants have met their burden does the plaintiff have to provide clear and convincing evidence that defendants' acts are not immunized from liability under the Act." *Id.*

The *Sandholm* court denied defendants relief under the Act, finding that "[d]efendants have not met their burden of showing that plaintiff's suit was based solely on their petitioning activities." *Id.* ¶ 57.

¶ 92    In *Ryan v. Fox Television Stations, Inc.*, 2012 IL App (1st) 120005, ¶ 21, this court interpreted the holding in *Sandholm* to require a defendant to "affirmatively demonstrate that the [plaintiff's] claim is a SLAPP within the meaning of the Act, that is, that the claim is meritless and was filed in retaliation against the [defendant's] protected activities in order to deter the [defendant] from further engaging in those activities." Following that ruling, this court in *Garrido* examined the "meritless" and "retaliatory" standard, noting that it was not included in the text of the Act but "originated in *Sandholm*." *Garrido*, 2013 IL App (1st) 120466, ¶ 19. The court concluded that a defendant could prove that plaintiff's claims were meritless by disproving some essential element of plaintiff's *prima facie* case. *Id.* ¶ 28 (citing *Ryan*, 2012 IL App (1st) 120005, ¶ 29). The *Garrido* court determined that the defendants in that case had not met their burden of demonstrating that plaintiff's claims were meritless "and thus have not carried their burden of proving that his lawsuit is a SLAPP." *Id.* ¶ 30.

¶ 93    Our court has consistently applied this burden-shifting framework for claims brought under the Act. See, *e.g.*, *Stein v. Krislov*, 2013 IL App (1st) 113806; *Samoylovich v. Montesdeoca*, 2014 IL App (1st) 121545; *Goral*, 2014 IL App (1st) 133236. In fact, in *Samoylovich*, this court addressed a challenge to this framework that was almost identical to the arguments raised by the NPES Defendants here. In rejecting Montesdeoca's arguments, this court found that he "ignore[d] the implicit subtext upon which the Act stands and which informs the Act's understanding of what it means for a lawsuit to be a SLAPP." *Samoylovich*, 2014 IL App (1st) 121545, ¶ 24. The court explained that, in *Sandholm*, the supreme court recognized the common-law origins of a SLAPP claim and formulated a test derived from the Act to determine whether a lawsuit is meritless and brought in retaliation to a party's participation in protected activity. *Id.* ¶¶ 25, 26. Essentially, this court found that the *Sandholm* court recognized that

SLAPP suits by their very nature are meritless and retaliatory and, thus, it is defendant's burden to demonstrate that plaintiff's suit meets this common-law standard. *Id.* The *Samoylovich* court explained that the "meritless" and "retaliatory" language is therefore not an unwarranted addition to the Act but allows the court to identify meritless SLAPP suits to achieve the Act's goal of "discouraging and eliminating meritless, retaliatory SLAPPs, as they have traditionally been defined." (Internal quotation marks omitted.) *Id.* ¶ 26 (citing *Sandholm*, 2012 IL 111443, ¶ 42). The court concluded that, under this framework, dismissal of a plaintiff's claim is not proper unless the defendant can show that "a claim is a meritless, retaliatory SLAPP as contemplated by the Act." *Id.* ¶ 30. Accordingly, we find that the circuit court did not err in requiring the NPES Defendants to establish that Chadha's claims were meritless and retaliatory in order to establish dismissal was proper under the Act. We will thus consider the NPES Defendants' contentions that the court erred in finding that they did not demonstrate that Chadha's claims were meritless and retaliatory.

¶ 94                     i. *NPES Defendants Failed to Demonstrate*
                              *That Chadha's Suit Was Meritless*

¶ 95    As discussed above, a party moving for dismissal under the Act can show that a claim is "meritless" only "if a movant disproves some essential element of the nonmovant's claim." *Garrido*, 2013 IL App (1st) 120466, ¶ 19. In their motion for dismissal under the Act, the NPES Defendants concluded that they adequately established the first prong of the Act analysis because all of the complained-of conduct in Chadha's complaint rested on government participation. They then contended that

> "Chadha admits that the actions of the [NPES Defendants] were all aimed at
> solely procuring favorable government action asserting that the [NPES Defendants]

turned to the government for relief either by petitioning the alderman for action; by attending and participating in hearings and encouraging members of the community to do the same; and by seeking judicial relief. Thus, the second prong has been met."

As the circuit court recognized, however, this conclusory argument does not disprove some essential element of Chadha's *prima facie* case as required to satisfy the second prong. *Id.* ¶ 28. In fact, it does not even address the merits of Chadha's claims. Rather than challenge the merits of Chadha's claims, the NPES Defendants solely focused on proving that they acted "in furtherance of [their] rights of petition, speech, association, or to otherwise participate in government" (735 ILCS 110/15 (West 2014)), which is a consideration under only the first prong. Accordingly, we find that the court did not err in finding that the NPES Defendants failed to establish that Chadha's claims were meritless. Although the circuit court ultimately granted the defendants' motion for summary judgment thus implicitly finding his claims meritless, this is a different consideration than whether the NPES Defendants carried their burden on this issue. Even if we were to find that the NPES Defendants sufficiently established that Chadha's claims were meritless, we would nonetheless find that they failed to establish that his claims were retaliatory.

¶ 96                              ii. *NPES Defendants Failed to*
                    *Demonstrate That Chadha's Suit Was Retaliatory*

¶ 97    In order to show that Chadha's suit was retaliatory, the NPES Defendants were required to establish that it was a " 'strategic lawsuit intended to chill participation in government or to stifle political expression,' " as opposed to a suit that sought redress for the injuries alleged. *Goral*, 2014 IL App (1st) 133236, ¶ 54 (quoting *Sandholm*, 2012 IL 111443, ¶ 57). In conducting this inquiry, courts generally consider two factors: "(1) the proximity in time between the

protected activity and the filing of the complaint, and (2) whether the damages requested are reasonably related to the facts alleged in the complaint and are a good-faith estimate of the extent of the injury sustained." (Internal quotation marks omitted.) *Id.* (quoting *Ryan*, 2012 IL App (1st) 120005, ¶ 23).

¶ 98     As the circuit court recognized, the timing of Chadha's complaint weighs heavily in favor of demonstrating that his lawsuit was not retaliatory. Chadha's initial complaint was filed in August 2013, and his amended complaint adding counts for the NPES Defendants' participation in protected conduct was filed in July 2014. Thus, Chadha did not file his suit while the NPES Defendants were engaged in protected conduct in 2010 and did not file the suit to deter the NPES Defendants from engaging in protected conduct. At the time Chadha filed his suit, the structure on the Property had already been demolished, and Chadha's complaint merely sought redress for that injury. Although Chadha's claims were based on the NPES Defendants' communications with government officials, among others, his claims did not have the intent of " 'chill[ing] participation in government or [stifling] political expression.' " *Id.* (quoting *Sandholm*, 2012 IL 111443, ¶ 57). This is especially true where the NPES Defendants had already participated in the protected activity, Chadha had already been allegedly injured by the NPES Defendants' participation, and there was no implicit threat of future governmental participation by the NPES Defendants that could cause Chadha further injury.

¶ 99     In addition, the damages Chadha requested were reasonably related to the facts alleged in the complaint. For damages, Chadha sought $300,000 as the difference between the expenses he incurred in constructing a new structure on the Property instead of rehabilitating the original structure as he intended. He also sought punitive damages of $500,000. This is not the type of damages typical of a retaliatory SLAPP. Rather, a "classic SLAPP scenario" is one where a

plaintiff seeks damages in the millions for alleged defamation. See *Ryan*, 2012 IL App (1st) 120005, ¶ 24. That is not the case here where the damages Chadha sought were a good-faith estimate of the extent of the injury sustained. Accordingly, we find that the NPES Defendants have failed to establish that Chadha's claims were meritless and retaliatory and the circuit court did not err in denying their motion to dismiss Chadha's claims pursuant to the Act.

¶ 100   We note that the NPES Defendants renewed their arguments under the Act in their motion for summary judgment. The circuit court again denied that aspect of their summary judgment motion. For the same reasons stated above, we find that the circuit court did not err when it denied the NPES Defendants' claim under the Act in their motion for summary judgment.

¶ 101                                   III. CONCLUSION

¶ 102   For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 103   Affirmed.