2026 IL App (1st) 240650-U

No. 1-24-0650

Order filed April 16, 2026

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| DENYSE WANG STONEBACK, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23-L-062022 |
| | ) | |
| KEVIN OLICKAL, FRIENDS OF KEVIN OLICKAL, | ) | Honorable |
| and GUN VIOLENCE PREVENTION PAC, | ) | Jeffrey L. Warnick, |
| | ) | Judge Presiding. |
| Defendants-Appellants. | ) | |

_____

JUSTICE LYLE delivered the judgment of the court.
Justices Ocasio and Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the judgment of the circuit court of Cook County where defendants failed to satisfy their burden to show that plaintiff filed her claims solely to interfere with and burden defendants' constitutional rights.

¶ 2    Defendants Kevin Olickal and Friends of Kevin Olickal (FOKO) (collectively, the "Olickal Defendants"), and Gun Violence Prevention PAC (GPAC) appeal from the circuit court's denial of their motions to dismiss the complaint of plaintiff Denyse Wang Stoneback pursuant to the Citizen Participation Act (Act) (735 ILCS 110/1 *et seq.* (West 2022)) and section 2-619(a)(9) of

the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(9) (West 2022)). Defendants asserted that Ms. Stoneback's complaint, which asserted claims of defamation *per se*, false light, and conspiracy based on flyers defendants sent to voters during a primary campaign between Ms. Stoneback and Mr. Olickal, represented a Strategic Lawsuit Against Public Participation (SLAPP). The circuit court disagreed, finding that defendants had failed to satisfy their burden under the Act to demonstrate that the claims in the complaint lacked merit and that the lawsuit was initiated in retaliation for defendants' exercise of protected speech.

¶ 3　　　Defendants now appeal, contending that the circuit court erred in denying their motions to dismiss under the Act where the claims in Ms. Stoneback's complaint are meritless and were filed solely to interfere with and burden defendants' exercise of their right to petition, speak, or otherwise participate in government. Defendants assert that Ms. Stoneback's claims are meritless because the statements in the flyers are nonactionable statements of opinion, the statements are true, and the statements are susceptible to an innocent construction. Defendants also assert that Ms. Stoneback's claims do not fall into any of the limited categories that constitute defamation *per se*. Defendants further contend that Ms. Stoneback's claims should be dismissed because they were filed in retaliation for defendants' exercise of protected speech. Finally, defendants maintain that the circuit court's ruling will have a "chilling effect" on future political speech that is critical of elected officials. For the reasons that follow, we affirm the judgment of the circuit court and remand for further proceedings consistent with this order.

¶ 4　　　　　　　　　　　I. BACKGROUND

¶ 5　　　　　　　　　A. Ms. Stoneback's Complaint

¶ 6　　　　　　　　　　1. *Factual Background*

¶ 7    Ms. Stoneback filed her complaint for defamation *per se*, false light, and civil conspiracy on May 9, 2023, and subsequently filed an amended complaint. Ms. Stoneback alleged that GPAC and the Olickal Defendants "engaged in a concerted effort to destroy" her reputation by "knowingly publishing false statements that portrayed Ms. Stoneback as an enemy to gun violence prevention despite [her] having been a well-known advocate and voice for gun violence prevention throughout the State of Illinois for nearly a decade." Ms. Stoneback began her complaint by reviewing her "decade of efforts to reduce gun violence" as an advocate in Illinois.

¶ 8    In 2020, Ms. Stoneback was elected as the State Representative for Illinois' 16th District. Ms. Stoneback alleged that, during her campaign, GPAC endorsed her based on her background as a gun violence prevention advocate. In 2021, Ms. Stoneback became the chief co-sponsor for House Bill 1091, which would have required universal background checks for all gun purchases, would have mandated fingerprinting for anyone applying for or renewing a Firearm Owner's Identification (FOID) card, and included funding for victims and communities affected by gun violence. Around the same time, House Bill 562 was introduced in the Illinois House of Representatives. As compared to House Bill 1091, House Bill 562 included a voluntary fingerprinting provision, rather than requiring mandatory fingerprinting for individuals to obtain or renew FOID cards.

¶ 9    Ms. Stoneback alleged that GPAC initially worked with her on House Bill 1091 and supported her as chief co-sponsor of the bill. However, when House Bill 562 was introduced, GPAC "decided to accept voluntary fingerprinting," telling Ms. Stoneback that " '[s]ome fingerprint is better than no fingerprint.' " Ms. Stoneback abstained from voting on House Bill 562. Both bills passed the Illinois House, but the Illinois Senate passed only House Bill 562, and in August 2021, the Illinois governor signed House Bill 562 into law.

¶ 10    In 2022, Ms. Stoneback ran for re-election to the Illinois House. Her opponent in the primary election was Mr. Olickal. During the primary, GPAC endorsed and supported Mr. Olickal. Ms. Stoneback alleged that in the lead up to the primary election, GPAC and the Olickal Defendants "engaged in a campaign that completely deconstructed [her] history of gun safety advocacy" and "engaged in a relentless bombardment of false statements" about her in an effort to destroy her reputation. Ms. Stoneback attached to her complaint flyers created by GPAC and the Olickal Defendants that were sent to voters during the primary. In her complaint, Ms. Stoneback made separate allegations against the Olickal Defendants and GPAC based on the statements made in the flyers they sent to voters.

¶ 11                    2. *Olickal Defendants Flyers and Allegations*

¶ 12    In the first flyer created and published by the Olickal Defendants, they stated that Ms. Stoneback "turned her back on the people that elected her by not supporting life-saving universal background checks, fingerprinting for gun license applications, and mental health and trauma support funding for survivors." The flyer also stated that Ms. Stoneback "failed to keep our children, families, and communities safe from illegal guns that have led to an increase in violence."

¶ 13    In the second flyer, the Olickal Defendants stated that that Ms. Stoneback "Chose to Stand with the NRA [National Rifle Association]" and "Ignored Victims of Gun Violence." The flyer further stated that together, Ms. Stoneback and the NRA "Did NOT Support Funding to Help Communities Affected By Gun Violence" and "Did NOT Listen to Grieving Victims of Gun Violence When They Begged for Real Solutions." In the third flyer, the Olickal Defendants stated that Ms. Stoneback "SAID NO to requiring background checks on gun purchases."

¶ 14    Based on the statements contained in these flyers, Ms. Stoneback alleged defamation *per se* against the Olickal Defendants. She asserted that the Olickal Defendants made the statements

in the flyers knowing that they were false, intentionally published the false statements to third parties, and did so with actual malice or with reckless disregard for the truth. Specifically, Ms. Stoneback asserted that she supported gun safety legislation and did not "stand with" the NRA. She did not "say no" to background checks on gun purchases and, in fact, supported stronger legislation. She further contended that she supported funding to help communities affected by gun violence and listened to those affected by gun violence. Ms. Stoneback asserted that the Olickal Defendants presented the statements in the flyers as statements of fact, intending that the recipients of the flyers would believe the statements to be an accurate representation of her views on background checks and gun violence prevention. Ms. Stoneback alleged that, as a result of the Olickal Defendants' conduct, she suffered and continued to suffer damages, including, but not limited to, harm to her reputation, harm to her standing in the community, and loss of income.

¶ 15    Ms. Stoneback contended that the statements in the flyers imputed an inability to perform her duties and imputed a lack of integrity "as an advocate for gun violence prevention." She further alleged that the statements "prejudiced" her profession as a state representative and "advocate for gun violence prevention." She concluded that the statements therefore constituted defamation *per se* and sought an award of compensatory and punitive damages.

¶ 16    Ms. Stoneback also raised a claim for false light invasion of privacy against the Olickal Defendants, alleging that the false statements the Olickal Defendants made in the flyers cast her in a false light by imputing that she lacked integrity and ability to perform her duties within her profession. She asserted that the statements in the flyers would be highly offensive to a reasonable person. As a result of this conduct, Ms. Stoneback suffered damages including harm to her reputation and loss of income.

¶ 17                    3. *GPAC Flyers and Allegations*

¶ 18    The first flyer sent by GPAC stated: "When asked by grieving mothers to support legislation to keep our children, families, and communities safe… [Ms.] Stoneback said No!" and that Ms. Stoneback "told grieving mothers who've lost children to gun violence she won't support their legislation." The flyer also stated that: "Only a politician like [Ms. Stoneback] would tell grieving mothers she knew best."

¶ 19    The second flyer created by GPAC depicted a voter roll call sheet from the Illinois House of Representatives. At the top, the document is titled: "STATE OF ILLINOIS ONE HUNDRED SECOND GENERAL ASSEMBLY HOUSE ROLL CALL HOUSE BILL 562 CONCURRENCE PREVAILED." The document depicts three columns, one labeled "75 YEAS," the second labeled "40 NAYS," and the third, partially cut off showing only "0." The "75 YEAS" is circled in red. The remainder of the document is blurred, obscuring the names and votes of the representatives. The top of the flyer reads: "As our very own Rep. [Ms. Stoneback] SAID NO to universal background checks on gun purchases seventy-five other elected officials said YES." The back of the flyer reads that Ms. Stoneback "refused to support universal background checks on gun purchases," and "Lucky for us other elected officials had the courage to step up and protect us."

¶ 20    The third GPAC flyer depicts a woman crying and reads: "Why did [Ms. Stoneback] tell grieving mothers NO to supporting universal background checks on gun purchases?" The flyer continues: "because for politicians like [Ms. Stoneback] it's my way or the highway."

¶ 21    Based on the statements in the flyers, Ms. Stoneback alleged defamation *per se* against GPAC. She asserted that, contrary to the statements made in the flyers, she never voted "No" on legislation seeking to prevent gun violence and consistently supported legislation to keep children, families, and communities safe from gun violence. Ms. Stoneback did not vote "No" on legislation

requiring universal background checks and voluntary fingerprinting, but instead supported legislation that required mandatory fingerprinting.

¶ 22    Ms. Stoneback alleged that GPAC made these statements knowing them to be false and published the statements to third parties. GPAC presented the statements as statements of fact, intending that the recipients of the flyers would believe that they were an accurate representation of Ms. Stoneback's views on background checks and gun violence prevention. Ms. Stoneback asserted that GPAC acted with actual malice or with reckless disregard for the truth by knowingly publishing the false statements. As a result of GPAC's conduct, Ms. Stoneback contended that she suffered and continued to suffer damages, including, but not limited to, harm to her reputation, harm to her standing in the community, and loss of income.

¶ 23    Ms. Stoneback contended that the statements in the flyers imputed an inability to perform her duties and imputed a lack of integrity "as an advocate for gun violence prevention." She further alleged that the statements "prejudiced" her profession as a state representative and "advocate for gun violence prevention." She concluded that the statements therefore constituted defamation *per se* and sought an award of compensatory and punitive damages.

¶ 24    Ms. Stoneback also raised a claim for false light invasion of privacy against GPAC, alleging that the false statements GPAC made in the flyers cast her in a false light by imputing that she lacked integrity and ability to perform her duties within her profession. She asserted that the statements in the flyers would be highly offensive to a reasonable person. As a result of this conduct, Ms. Stoneback suffered damages including harm to her reputation and loss of income.

¶ 25                    4. *Civil Conspiracy and Prayer for Relief*

¶ 26    Finally, Ms. Stoneback alleged civil conspiracy against both the Olickal Defendants and GPAC based on the statements contained in their flyers. Ms. Stoneback alleged that defendants

acted in concert to publish false statements about her in an effort to harm her reputation among voters. She asserted that defendants' unlawful conduct caused her damages in that she was not re-elected and continued to suffer damages in her role as a gun violence prevention advocate.

¶ 27    In her prayer for relief, Ms. Stoneback sought an award of compensatory damages in an amount of "no less than $500,000" and punitive damages of "no less than $500,000 or the amount awarded in compensatory damages, whichever is greater."

¶ 28                              B. Motions to Dismiss

¶ 29    Both defendants filed motions to dismiss Ms. Stoneback's complaint pursuant to the Act. In their motions, defendants contended that the complaint was a SLAPP action that should be dismissed pursuant to the Act and section 2-619(a)(9) of the Code. 735 ILCS 5/2-619(a)(9) (West 2022).[1] Defendants asserted that all three requirements for dismissal under the Act were satisfied where: (1) their actions in sending the flyers were in furtherance of their right to petition, speak, associate, or otherwise participate in government; (2) Ms. Stoneback's claims were solely based on, related to, or in response to defendants' actions in furtherance of those rights, and (3) Ms. Stoneback had not proven by clear and convincing evidence that the defendants' acts were not genuinely performed to procure favorable government action. See *Goral v. Kulys*, 2014 IL App (1st) 133236, ¶ 34.

¶ 30    Defendants maintained that the statements in the flyers were protected under the first amendment of the United States Constitution (U.S. Const., amend. I) as communications with potential voters in a political election. See *Garrido v. Arena*, 2013 IL App (1st) 120466. Defendants asserted that Ms. Stoneback's defamation *per se* claims were meritless because the

---

[1] GPAC also asserted that Ms. Stoneback's complaint should be dismissed pursuant to section 2-615 of the Code. 735 ILCS 5/2-615 (West 2022).

statements in the flyers were non-actionable statements of opinion, the statements were true, the statements were susceptible to an innocent construction, and the statements did not constitute defamation *per se*. Defendants contended that because Ms. Stoneback failed to state a claim for defamation *per se*, her claims for false light and conspiracy must also be dismissed. Finally, although they challenged the requirement to make such a showing under the Act, defendants asserted that Ms. Stoneback's suit was "retaliatory." Defendants maintained that Ms. Stoneback's decision not to file her complaint until the statute of limitations had almost expired suggested that she initiated the lawsuit for reasons other than seeking redress for the alleged defamation. Defendants also asserted that Ms. Stoneback's request for compensatory damages of "no less than $500,000" and punitive damages suggested that the damages she requested were not a good faith estimate of the extent of the injury she sustained. See *Goral*, 2014 IL App (1st) 133236, ¶ 54.

¶ 31                                 C. Response to Motion to Dismiss

¶ 32    In response, Ms. Stoneback asserted that the instant lawsuit was not a SLAPP under the Act because defendants failed to demonstrate that her claims were meritless. Ms. Stoneback contended that defendants' statements were false because they equated her abstention on House Bill 562 to a "no" vote, which is a false equivalency. Ms. Stoneback also maintained that defendants' statements tying her to the NRA were similarly false where she never collaborated or worked with the NRA and, in fact, stood opposed to the NRA's values.

¶ 33    She asserted that defendants' statements constituted defamation *per se* because they imputed her inability to perform and lack of integrity in performing her duties as a state representative and gun control advocate. She contended that defendants' statements represented her as a "turncoat" who supported gun violence prevention in order to get elected and then turned her back on her constituents. Defendants' statements therefore attacked her duty to faithfully

represent her constituents, her primary duty as an elected official. These statements also directly implicated Ms. Stoneback's integrity and personal character. Ms. Stoneback contended that defendants' contentions that the statements were substantially true or subject to an innocent construction were affirmative defenses to a claim of defamation, which may not be raised to establish that a plaintiff's claim is a SLAPP under the Act.

¶ 34 Finally, Ms. Stoneback asserted that the lawsuit was not retaliatory. She asserted that she waited until nearly the end of the statute of limitations to file her complaint because she struggled with the decision of whether she wanted to proceed with the litigation. She noted that she was not planning to run in the upcoming election in March 2024 and her suit had no bearing on her future political aspirations. She maintained that she was seeking genuine relief for the injuries she sustained and her claim for damages of "no less than $500,000" was intended to place the question of damages "squarely within the province of the jury."

¶ 35                           D. Circuit Court's Ruling

¶ 36 Following a hearing on defendants' motions to dismiss, the circuit court denied the motions in an oral ruling. The court noted that because the motions were filed pursuant to section 2-619 of the Code, it was required to accept the allegations in Ms. Stoneback's complaint as true. The court observed that the Olickal Defendants' flyers implied that Ms. Stoneback was aligned with the NRA, which the court believed in Cook County was the "equivalent" of saying someone was aligned with the "KKK." The court observed that GPAC did not reference the NRA in its flyers, but said that Ms. Stoneback "said no" to grieving mothers. The flyers did not mention that these statements were related to Ms. Stoneback's vote, or non-vote, on a particular bill. The court believed that defendants' statements constituted defamation *per se* because they impugned Ms. Stoneback's reputation and painted her as a gun advocate.

¶ 37   The court found that Ms. Stoneback's request for damages was reasonable because she was not asking for "a gazillion dollars." The court observed that Ms. Stoneback had "paid a price" politically and had adequately alleged that she paid a price "personally" based on defendants' defamatory statements. The court did not believe that defendants established the suit was retaliatory merely because Ms. Stoneback sought punitive damages because the court would ultimately determine whether she could be awarded punitive damages after hearing all the evidence. The court therefore denied the motions, finding that Ms. Stoneback's suit was not a SLAPP under the Act, that she had sufficiently pled all counts of defamation *per se* and false light, and that her claims were not meritless or retaliatory.

¶ 38                          E. Defendants' Appeal

¶ 39   This court granted defendants' joint petition for leave to appeal the circuit court's order pursuant to Illinois Supreme Court Rule 306(a)(9) (eff. Oct. 1, 2020). We therefore find that we have jurisdiction to consider the merits of this appeal.

¶ 40                          II. ANALYSIS

¶ 41   On appeal, defendants contend that we should reverse the circuit court's order and remand with instructions to dismiss Ms. Stoneback's lawsuit as an improper SLAPP under the Act. Defendants assert that Ms. Stoneback's claims of defamation *per se* are meritless and the lawsuit was initiated in retaliation for defendants' exercise of protected speech under the first amendment. Defendants maintain that because Ms. Stoneback's defamation claims are meritless, her claims for false light and conspiracy must also fail. Defendants also contend that, if allowed to stand, the circuit court's order would have a chilling effect on future political speech leading to frequent lawsuits between political opponents.

¶ 42                          A. Standard of Review

¶ 43    The Olickal Defendants brought their motion to dismiss pursuant to section 2-619(a)(9) of the Code, while GPAC brought its motion to dismiss pursuant to sections 2-619 and 2-615 of the Code. In their brief before this court, defendants do not raise any arguments with regard to the portion of GPAC's motion to dismiss that argued that Ms. Stoneback's complaint should be dismissed pursuant to section 2-615. As our supreme court has explained, a motion to dismiss based on the immunity conferred by the Act is more appropriately raised in a section 2-619(a)(9) motion, which allows for dismissal when the claim asserted against the defendant is " 'barred by other affirmative matter avoiding the legal effect of or defeating the claim.' " *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 54 (quoting 735 ILCS 5/2-619(a)(9) (West 2008)).

¶ 44    A motion to dismiss under section 2-619(a) admits the legal sufficiency of the plaintiff's claim, but asserts there are defects or defenses outside the pleadings which defeat the claim. *Wallace v. Smyth*, 203 Ill. 2d 441, 447 (2002). When ruling on a motion to dismiss under section 2-619, the court should construe the pleadings and all evidentiary material in a light most favorable to the nonmoving party. *Capeheart v. Terrell*, 2013 IL App (1st) 122517, ¶ 11. "The court must accept as true all well-pleaded facts in the plaintiff's complaint and all inferences that may reasonably be drawn in the plaintiff's favor." *Id.* Our review is *de novo*. *Sandholm*, 2012 IL 111443, ¶ 55.

¶ 45                    B. Dismissal Under the Act

¶ 46    A motion to dismiss under the Act requires an expedited hearing within 90 days of the motion, discovery is not permitted except by order of the court, and "the court shall 'award a moving party who prevails in a motion under this Act reasonable attorney's fees and costs incurred in connection with the motion.' " *Sandholm*, 2012 IL 111443, ¶¶ 39-40 (quoting 735 ILCS 110/25

(West 2008)). As such, dismissal of a lawsuit pursuant to the Act is a "drastic and extraordinary remedy" due to the "severe penalties" imposed on the plaintiff. *Id.* ¶ 51.

¶ 47    The first step in determining whether a lawsuit should be dismissed under the Act is determining whether the suit constitutes a SLAPP. *Id.* ¶ 43. SLAPPs are lawsuits that "(1) aim at preventing citizens from exercising their political rights or punishing those who have done so; (2) use the threat of money damages or the prospect of defense costs to silence citizen participation; and (3) are based upon nothing more than the defendant's exercise of his rights to petition, free speech, and participate in government." *Capeheart*, 2013 IL App (1st) 122517, ¶ 12 (citing *Sandholm*, 2012 IL 111443, ¶ 33). SLAPPs, however, are often difficult to distinguish from ordinary lawsuits. *Garrido*, 2013 IL App (1st) 120466, ¶ 16. This court has devised a three-step analysis for determining whether a lawsuit is a SLAPP and should be dismissed under the Act:

> "(1) the movant's acts were in furtherance of his right to petition, speak, associate, or otherwise participate in government to obtain favorable government action; (2) the nonmovant's claims are solely based on, related to, or in response to the movant's acts in furtherance of his constitutional rights; and (3) the nonmovant fails to produce clear and convincing evidence that the movant's acts were not genuinely aimed at solely procuring favorable government action." *Chicago Regional Council of Carpenters v. Jursich*, 2013 IL App (1st) 113279, ¶ 17.

If a plaintiff's complaint genuinely seeks redress for damages from defamation or other intentional torts, it does not constitute a SLAPP and it is irrelevant whether the defendants' actions were genuinely aimed at procuring favorable government action. *Sandholm*, 2012 IL 111413, ¶ 53.

¶ 48                           1. *Defendants' Acts*

¶ 49    We must first determine whether defendants' acts in this case were in furtherance of their rights to petition, speak, associate, or otherwise participate in government to obtain favorable government action. Defendants bear the burden of establishing the first prong. *Garrido*, 2013 IL App (1st) 120466, ¶ 16. In their brief before this court, defendants assert that Ms. Stoneback does not dispute that defendants' actions in mailing the flyers were actions in furtherance of their right to petition, speak, associate, or otherwise participate in government to obtain favorable government action. In her response brief, Ms. Stoneback acknowledges that she does not contest that defendants have satisfied the first step of the analysis set forth above. Indeed, this court has recognized that sending mailers to potential voters during a political campaign in an attempt to communicate with the electorate is an action in furtherance of the first amendment right to petition, speak, associate, or otherwise participate in government. *Id.* ¶ 17.

¶ 50                                    2. *Meritless and Retaliatory*

¶ 51    Having found that defendants have satisfied their burden under the first step, we next address whether defendants have established that Ms. Stoneback's claims are solely based on, related to, or in response to defendants' acts in furtherance of their constitutional rights. This court has found that to satisfy its burden under this prong, a movant must affirmatively demonstrate that the plaintiff's claim is a SLAPP by showing that the claim is "meritless and was filed in retaliation against the movant's protected activities in order to deter the movant from further engaging in those activities." *Ryan v. Fox Television Stations, Inc.*, 2012 IL App (1st) 120005, ¶ 21. As this court has recognized, the Act itself does not include a requirement that the moving party establish that the nonmoving party's claims are "meritless and retaliatory." *Garrido*, 2013 IL App (1st) 120466, ¶ 19. Rather, this court devised this test based on the supreme court's decision in *Sandholm*, and the *Sandholm* court did not define either term. *Id.*

¶ 52     This court has determined that a claim is "meritless" if the movant disproves an essential element of the claim. *Id.* As such, it is not sufficient for the movant to seek dismissal based on perceived pleading defects in the complaint because a motion brought pursuant to section 2-619(a)(9) concedes the legal sufficiency of the claim. *Id.* ¶¶ 21-22. Instead, the moving party must show that the claim is "factually baseless." *Id.* ¶ 23. In the context of defamation claims, such as the ones Ms. Stoneback raises here, the defendants can satisfy this burden by showing that the allegedly defamatory statements are true. *Id.* (citing *Wright Development Group, LLC v. Walsh*, 238 Ill. 2d 620, 638 (2010)). This is because falsity is an essential element of defamation. *Id.* By contrast, defendants cannot satisfy their burden to demonstrate that Ms. Stoneback's defamation *per se* claims are meritless by asserting that the allegedly defamatory statements do not fall into one of the recognized categories for defamation *per se*. *Id.* ¶ 22. This argument goes to the sufficiency of the complaint, which, as noted, defendants have admitted by filing motions pursuant to section 2-619 of the Code. *Id.* ¶ 22. These principles in mind, we turn to whether defendants have satisfied their burden to establish that Ms. Stoneback's claims are meritless.

¶ 53     Defendants raise four contentions that they assert demonstrate that Ms. Stoneback's defamation claims are meritless. Defendants assert that the statements in the flyers are "nonactionable statements of opinion," that the statements are true, and that the statements are "susceptible to an innocent construction." Defendants also contend that Ms. Stoneback's defamation *per se* claims are meritless because they do not fall into any of the recognized categories that constitute defamation *per se*. As noted, however, this contention attacks the sufficiency of Ms. Stoneback's complaint, which defendants have conceded through their motions to dismiss.

¶ 54                                    i. *Defamation Per Se*

¶ 55 "A statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with her." *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 87 (1996). To prove defamation *per se*, a plaintiff must present facts "showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and the publication caused damages." *Andrews v. At World Properties, LLC*, 2023 IL App (1st) 220950, ¶ 14. A statement is defamatory *per se* if its harm is obvious and apparent on its face. *Green v. Rogers*, 234 Ill. 2d 478, 491 (2009). Illinois recognizes five categories of statements that are considered defamatory *per se*:

"(1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication." *Id.* at 491-92.

¶ 56 However, even statements that fall into one of the five categories of defamation *per se* will not be actionable if the statements are: (1) nonactionable statements of opinion (*Maag v. Illinois Coalition for Jobs, Growth & Prosperity*, 368 Ill. App. 3d 844, 851 (2006)); (2) true (*Seitz-Partridge v. Loyola University Chicago*, 2013 IL App (1st) 113409, ¶ 21); or (3) reasonably capable of an innocent construction (*Andrews*, 2023 IL App (1st) 220950, ¶ 16). Defendants rely on each of these defenses in contending that Ms. Stoneback's defamation claims are meritless.

¶ 57 Ms. Stoneback, however, asserts these arguments are affirmative defenses to her claims of defamation *per se* that should not be considered in determining whether her claims have merit under the Act. In support of this assertion, Ms. Stoneback relies on this court's decision in *Garrido*,

2013 IL App (1st) 120466, ¶ 25, where the court found that the defendants' contentions that they could not be liable for making the allegedly defamatory statements because the statements were "substantially true" or were "conditionally privileged" were affirmative defenses. Notably, the *Garrido* court did not find that nonactionable statements of opinion or innocent construction are affirmative defenses.

¶ 58    Subsequent decisions of this court have questioned this analysis in *Garrido*, noting that the *Garrido* court determined, without citation to authority, that the term "meritless" as used by the supreme court in *Sandholm* was a "term of art" that " 'means something more' " than an unsuccessful legal claim or theory under the Act. See *Kainrath v. Grider*, 2018 IL App (1st) 172270, ¶¶ 35, 39. As the *Kainrath* court stated: "Certainly a claim is meritless if an essential element of the plaintiff's *prima facie* case is disproved, but is it not equally meritless if it is doomed to fail because it is subject to an obvious affirmative defense?" *Id.* ¶ 39. The *Kainrath* court declined to resolve the question, however, finding that even if an affirmative defense could provide a basis for dismissal of a claim under the Act, the defendants in that case had failed to establish that a privilege applied to the allegedly defamatory comments. *Id.* ¶ 40. We likewise find it unnecessary to resolve the question posed by the *Kainrath* court in this case because we find that Ms. Stoneback's claims of defamation *per se* are meritless because the statements in defendants' flyers were substantially true.

¶ 59                                    ii. Meritless

¶ 60    Defendants contend that the statements in the flyers focused on Ms. Stoneback's refusal to vote "Yes" on a particular bill and the effects of that refusal. Defendants point out that House Bill 562 required universal background checks for gun purchases, voluntary fingerprinting for FOID cards and renewal, contained certain funding provisions for communities affected by gun violence,

and was opposed by the NRA. Defendants maintain that by abstaining from voting "Yes" on the bill, Ms. Stoneback "said no" to these requirements and took the same side as the NRA. Defendants acknowledge that an abstention is not the same as voting "No," but assert that because a bill can pass the Illinois House only if a majority of the members vote "Yes," an abstention has the same effect as a "No" vote.

¶ 61     Ms. Stoneback first contends, again relying on *Garrido*, that "truth" and "substantial truth" are separate concepts when raised in the context of a claim of defamation. She seems to concede that "truth" is not an affirmative defense because it attacks an essential element of a claim of defamation, but maintains that "substantial truth" is an affirmative defense. However, a plaintiff is required to plead falsity as an element of a claim of defamation. See *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 300 (2001) ("The plaintiff argues, however, that truth is an affirmative defense and that the defendant failed to plead it in a timely manner. As we have noted, decisions of this court have reached the opposite conclusion, characterizing falsity as an element of the defamation plaintiff's cause of action."). Thus, "[w]hile 'substantial truth' can be an affirmative defense to a defamation suit, falsity is also an element of the defamation plaintiff's cause of action." *Tirio v. Dalton*, 2019 IL App (2d) 181019, ¶ 52 (citing *Kapotas v. Better Government Ass'n*, 2015 IL App (1st) 140534, ¶ 34).

¶ 62     "Substantial truth" in this context refers to the "level" of "truth" that a defendant is required to show to establish that the statements are true. See *Seitz-Partridge*, 2013 IL App (1st) 113409, ¶ 21 ("Only substantial truth is required for" the defense of "truth." (Internal quotation marks omitted.)) (quoting *Wynne v. Loyola University of Chicago*, 318 Ill. App. 3d 443, 451 (2000)). Other courts have characterized the level of truth that the defendant is required to show to establish truth as a defense to a claim of defamation as the "gist" or "sting" of truth of the allegedly

defamatory material. *Cianci v. Pettibone Corp.*, 298 Ill. App. 3d 419, 424 (1998). "While substantial truth is normally a question for the jury, where no reasonable jury could find that substantial truth had not been established, the question is one of law." *Wynne*, 318 Ill. App. 3d at 451-52.

¶ 63    In contending that the statements in defendants' flyers were false, and thus actionable, Ms. Stoneback focuses on the distinction between her abstention and a "No" vote. She maintains that she made the reasons for her abstention obvious, that she supported the bill with stronger, mandatory fingerprinting, and defendants knew at the time they distributed the flyers that Ms. Stoneback abstained from the vote as a form of protest to the voluntary fingerprinting requirement in House Bill 562.

¶ 64    Notably, however, none of the statements in the flyers said that Ms. Stoneback "voted no" on the bill. In the first flyer sent by the Olickal Defendants, they said that Ms. Stoneback did not support "universal background checks, fingerprinting for gun license applications, and mental health and trauma support funding for survivors." This is true. As Ms. Stoneback herself acknowledges, House Bill 562 included these provisions, and she did not support the bill. Similarly, the third Olickal Defendants flyer stated that Ms. Stoneback "SAID NO to requiring background checks on gun purchases." Notably, the flyer did not state that Ms. Stoneback "voted no." By abstaining, she implicitly "said no" to the provisions in the bill.

¶ 65    The second Olickal Defendants flyer stated that Ms. Stoneback "Chose to Stand with the NRA" and "Together with the NRA Did NOT Support Funding to Help Communities Affected By Gun Violence." Ms. Stoneback asserts that these statements imply that Ms. Stoneback worked with the NRA, which is patently false. However, the thrust of these statements is that by refusing to support House Bill 562, Ms. Stoneback refused to support the provisions of the bill, which

included universal background checks for gun purchases, voluntary fingerprinting, and funding to communities. The NRA also opposed the bill and these provisions. Thus, these statements, "[w]hile simplistic and misleading," are also true. *Maag*, 368 Ill. App. 3d at 852.

¶ 66    The same is true of the statements in GPAC's flyers. Like the flyers sent by the Olickal Defendants, the GPAC flyers never stated that Ms. Stoneback "voted no" on the bill, but rather that she "said no" to the provisions in the legislation and "said no" to "grieving mothers." The flyers also stated that 75 representatives "said YES" while Ms. Stoneback "SAID NO." It is true that 75 members of the Illinois House voted Yea on House Bill 562.

¶ 67    For the most part, the inaccuracies that Ms. Stoneback identifies in defendants' flyers focus on the "left out" explanations as to why she abstained from voting on House Bill 562 and the distinction between her abstention and "voting no." See *Maag*, 368 Ill. App. 3d at 852 ("For the most part, the inaccuracies have to do with what was left out—legal explanations as to why certain results were reached, commonly known to laymen as " 'technicalities' "). The fact that Ms. Stoneback abstained from voting on House Bill 562 because she supported a—in her view— "stronger" bill, does not render the statements in defendants' flyers false. Ms. Stoneback acknowledges that she did not support a bill that included the safeguards that defendants identified in their flyers: universal background checks, fingerprinting for FOID cards, and funding for communities affected by gun violence. Defendants were not required to provide voters with additional information about the reasons for Ms. Stoneback's abstention.

¶ 68    It is important to note that these flyers were sent to potential voters as part of a contested political campaign. *Maag*, 368 Ill. App. 3d at 851. These statements were designed to generate fear and anger among the electorate. *Id.* at 852. However, this does not mean they are actionable as defamatory because "they are substantially true even through not accurate in every detail." *Id.*;

see also *Andrews*, 2023 IL App (1st) 220950, ¶ 23 ("a defendant need not justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details." (Internal quotation marks omitted.) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991))); *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 42 (noting that, as to substantial truth, "allegedly defamatory material is not actionable even where it is not technically accurate in every detail").

¶ 69    Accordingly, we find that Ms. Stoneback's claims of defamation *per se* are meritless because the statements in defendants' flyers are substantially true or have the "gist" or "sting" of truth. As such, we find that her claims for false light, which are based on the same allegations as her claims of defamation *per se*, and her conspiracy claim are also meritless. See *Seith v. Chicago Sun-Times, Inc.,* 371 Ill. App. 3d 124, 139 (2007) ("because the plaintiff's unsuccessful defamation *per se* claim is the basis of his false-light claim, plaintiff's false-light invasion of privacy claim fails as well."); *Coghlan*, 2013 IL App (1st) 120891, ¶ 59 ("conspiracy is not an independent tort: the conspiracy claim fails if the independent cause of action underlying the conspiracy allegation fails.").

¶ 70                                 ii. Retaliatory

¶ 71    Having found that Ms. Stoneback's claims are meritless, we proceed to the second step of the analysis: whether Ms. Stoneback filed her lawsuit in retaliation for the defendants' exercise of their political rights. *Goral*, 2014 IL App (1st) 133236, ¶ 38. A lawsuit is retaliatory if it is " 'a strategic lawsuit intended to chill participation in government or to stifle political expression,' as opposed to a suit that 'seek[s] damages for the personal harm to [plaintiff's] reputation from defendant['s] alleged defamatory *** acts.' " *Id.* ¶ 54 (quoting *Sandholm,* 2012 IL 111443, ¶ 57). In determining whether a lawsuit is retaliatory, courts have typically looked to two factors: "(1)

the proximity in time between the protected activity and the filing of the complaint, and (2) whether the damages requested are reasonably related to the facts alleged in the complaint and are a good-faith estimate of the extent of the injury sustained." (Internal quotation marks omitted.) *Id.* (quoting *Ryan*, 2012 IL App (1st) 120005, ¶ 23).

¶ 72    Defendants contend, however, that they are not required to establish that Ms. Stoneback's lawsuit is retaliatory in order to satisfy their burden under the Act. Defendants maintain that the Act does not require that the claims be "retaliatory" in order for dismissal and courts that have read that requirement into the Act have done so based on a misinterpretation of *Sandholm*. Defendants' argument in this regard in premised on Justice Hyman's dissent in *Glorioso v. Sun-Times Media Holdings, LLC*, 2023 IL App (1st) 211526 (*Glorioso I*). In *Glorioso I*, this court affirmed the circuit court's denial of the defendants' motion to dismiss the plaintiff's complaint as a SLAPP, finding, *inter alia*, that the timing of the lawsuit and the amount of damages sought did not support a finding that the suit was "retaliatory." Justice Hyman dissented, challenging the appellate court's application of the "meritless and retaliatory" standard. *Id.* ¶¶ 70-108 (Hyman, J., dissenting). Justice Hyman traced the origins of the standard to this court's decision in *Ryan*, 2012 IL App (1st) 120005, which was issued shortly after the supreme court's decision in *Sandholm*. *Id.* ¶ 82. Justice Hyman noted that, despite the *Ryan* court's citation to *Sandholm*, the *Sandholm* court did not say that a movant must show that the plaintiff's complaint is meritless *and* retaliatory in order for dismissal under the Act. *Id.* ¶¶ 82-83. Justice Hyman believed that *Ryan* misread *Sandholm* and improperly placed the burden on the defendant to show the plaintiff's claims were both meritless and retaliatory. *Id.* ¶ 83.

> "Apart from having no basis, requiring that a defendant show a complaint is retaliatory and meritless makes no sense. A meritless claim has no possibility of success, and allowing a

plaintiff to proceed anyhow undermines judicial economy and annuls the Act's aim to dispose of facially invalid cases quickly. Further, allowing meritless claims to proceed permits a plaintiff to engage in the abuse the Act sought to avoid." *Id.* ¶ 85.

Justice Hyman also observed that courts had difficulty applying the two retaliation factors—proximity and damages—and asked the supreme court for clarity and correction. *Id.* ¶¶ 86-87, 107. In Justice Hyman's view, a defendant's motion to dismiss under the Act should be granted if "(i) the defendant's conduct was solely to further their right to petition, speak, associate, or otherwise participate in government to obtain favorable government action and (ii) the plaintiff's claim is meritless." *Id.* ¶ 90. Justice Hyman's approach therefore would eliminate the "retaliatory" prong altogether.

¶ 73    The supreme court allowed the defendants' petition for leave to appeal in *Glorioso I* and discussed Justice Hyman's dissent, noting his "painstaking[]" outline of the origin of the "meritless and retaliatory" test. *Glorioso v. Sun-Times Media Holdings, LLC*, 2024 IL 130137, ¶ 47 (*Glorioso II*). The *Glorioso II* court later noted that "that the parties differ as to whether the second prong of the post-*Sandholm* test requires defendants to show that the lawsuit is meritless, retaliatory, or both." *Id.* ¶ 56. The supreme court, however, did not reach the issue, finding that the defendants could not satisfy the first prong of the *Sandholm* standard where the defendants' conduct did not constitute acts in furtherance of government participation. *Id.* ¶ 80.

¶ 74    In *Anderson v. Smith*, 2025 IL App (4th) 241076, ¶¶ 44-46, the Fourth District addressed the "retaliatory" inquiry, but did not adopt the standard suggested by Justice Hyman in his dissent. The *Anderson* court found that *Sandholm* requires the court to consider the plaintiff's "true goal" and "genuineness" when filing the lawsuit, but found that *Ryan* and its progeny "fail to recognize the inherently factual nature of that inquiry." *Id.* ¶ 44. Under *Anderson's* application of the Act

and *Sandholm*, a defendant filing a motion to dismiss under the Act would have the initial burden of supplying evidence to demonstrate: "(1) an objective person would find that her acts were reasonably calculated to elicit a favorable government action or outcome and (2) the plaintiff's true goal is to chill participation in government or to stifle political expression, rather than to seek damages." *Id.* ¶ 72. If the defendant fails to satisfy this initial burden, the court must deny the motion. *Id.* If, however, the defendant satisfies this burden, the burden shifts to the plaintiff to show: "(1) evidence that the defendant's showing on either of the first two prongs is unfounded or (2) clear and convincing evidence that defendant's acts were not genuinely aimed at procuring favorable government action." *Id.* ¶ 73. The *Anderson* court determined that if the evidence presented on these factors created a "genuine factual dispute" then the trial court must conduct an evidentiary hearing to decide the disputed factual issues. *Id.* ¶ 75.

¶ 75    *Anderson's* "true goal" standard finds support in *Sandholm* where the court reversed the circuit court's dismissal of the plaintiff's complaint under the Act finding that the "true goal of [the] plaintiff's claims [was] not to interfere with and burden defendants' free speech and petition rights, but to seek damages for the personal harm to his reputation from defendants' alleged defamatory and tortious acts." *Sandholm*, 2012 IL 111443, ¶ 57. "In other words, if the plaintiff's intent in bringing suit is to recover damages for alleged defamation and not to stifle or chill defendants' rights of petition, speech, association, or participation in government, it is not a SLAPP and does not fall under the purview of the Act." *Id.* ¶ 42. Notably, the *Sandholm* court did not find that a plaintiff's claims should be dismissed where there is a showing that the defendant engaged in a protected activity and the plaintiff's claims are meritless. Thus, the standard suggested by Justice Hyman stops short. *Sandholm* requires the court to examine the purpose— the true goal—behind the plaintiff's claims: whether the plaintiff is genuinely seeking redress for

the alleged injury or whether the plaintiff is solely seeking to stifle or chill the defendants'
constitutional rights, *i.e.*, whether the plaintiff initiated the lawsuit solely to "retaliate" against the
defendants based on their exercise of protected speech. See *Ryan*, 2012 IL App (1st) 120005, ¶ 21.
Thus, whether termed "true goal," "genuineness," or "retaliatory," the inquiry is the same.

¶ 76    As such, we find that factors relevant in determining the "true goal" of a plaintiff's claims
are the same factors this court has identified in determining whether those claims are "retaliatory";
namely, (1) the proximity in time between the protected activity and the filing of the complaint,
and (2) whether the damages requested are a reasonably good-faith estimate of the extent of the
injury sustained. See *Ryan*, 2012 IL App (1st) 120005, ¶ 23. While a full evidentiary hearing, as
suggested by *Anderson*, may be necessary in some cases to determine the plaintiff's "true goal,"
we find that such a hearing is not warranted here where the circumstances show that the "true goal"
of Ms. Stoneback's complaint was not to stifle or chill the defendants' constitutional rights.

¶ 77    In this case, it is clear that the true goal of Ms. Stoneback's complaint was not to interfere
with or burden defendants' constitutional rights, but to seek redress and compensation for their
alleged defamatory and tortious acts. Defendants maintain that the proximity factor weighs in favor
of finding that the true goal of Ms. Stoneback's claims was to retaliate against defendants for the
exercise of their constitutional rights, pointing out that she waited until nearly the expiration of the
statute of limitations before filing the complaint. However, this court has traditionally found
retaliatory intent when a claim lacking merit is filed in *close proximity* to the alleged exercise of
protected rights. See *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 126 (2010) ("retaliatory
intent may be inferred when a claim lacking merit is filed shortly after the exercise of protected
rights."); *Ryan*, 2012 IL App (1st) 120005, ¶ 23 (finding that where the plaintiff filed his complaint
within three days of the complained-of conduct, the "short amount of time" was not necessarily

"dispositive evidence of retaliatory intent," but was a "probative fact."). In contrast, this court has found that waiting until shortly before the expiration of the statute of limitations does not indicate an attempt to interfere with the defendants' future exercise of protected rights. *Glorioso I*, 2023 IL App (1st) 211526, ¶ 62; but see *Stein v. Krislov*, 2013 IL App (1st) 113806, ¶ 19 (finding "some" evidence of retaliatory intent where the plaintiff filed his libel claim just before the expiration of the statute of limitations in order to make defendants " 'pay' " for their conduct despite the fact that the plaintiff suffered minimal loss and only speculative damages).

¶ 78    In this case, we could infer that Ms. Stoneback's true goal was to interfere with or burden defendants' constitutional rights based on the timing of the lawsuit if Ms. Stoneback filed this action during the campaign, while defendants were in the process of mailing the flyers, in an effort to prevent defendants from sending additional flyers to voters. See *Ryan*, 2012 IL App (1st) 120005, ¶ 23 (finding evidence of retaliatory intent where the plaintiff filed his lawsuit based on a series of news segments while the segments were airing and before one of the segments had aired). We could also infer the true goal was to interfere with or burden defendants' constitutional rights if Ms. Stoneback filed this lawsuit shortly before seeking political office to prevent defendants from sending similar flyers during that campaign. *Goral*, 2014 IL App (1st) 133236, ¶ 57 (finding that the timing of the plaintiff's lawsuit suggested that she sued the defendant in anticipation of her upcoming campaign for state representative); see also *Chadha v. North Park Elementary School Association*, 2018 IL App (1st) 171958, ¶ 98 (finding no evidence of retaliatory intent where the plaintiff had already been injured by the defendants' actions and there was no implicit threat of future governmental participation by the defendants that could result in future injury to the plaintiff). However, neither situation is present here.

¶ 79    Similarly, Ms. Stoneback's claim for damages does not suggest that her true goal was to interfere with or burden defendants' constitutional rights. This court has described a "classic SLAPP scenario" as one where the plaintiff demands damages of millions of dollars based on a single claim of defamation. *Ryan*, 2012 IL App (1st) 120005, ¶ 23. In *Ryan*, the plaintiff sought compensatory damages of more than $28 million in addition to unspecified punitive damages. Similarly, in *Hytel*, the plaintiff sought $1 million in compensatory damages and $3 million in punitive damages, along with forfeiture and repayment of all the wages paid to the defendant based on claims of breach of fiduciary duty and fraudulent misrepresentations. *Hytel*, 405 Ill. App. 3d at 115. Defendants here assert that Ms. Stoneback is essentially seeking "unlimited" damages based on her plea of compensatory damages of "no less" than $500,000 and punitive damages of "no less" than $500,000. First, we recognize that it is commonplace for plaintiffs to plead damages of "no less than" or "at least" a certain dollar amount in a complaint. Secondly, this court has found that a finding of retaliatory intent is not warranted where a claim is not seeking "millions" in damages, but instead includes a plea for "an unspecified amount in compensatory damages and exemplary damages." *Jursich*, 2013 IL App (1st) 113279, ¶ 29.

¶ 80    Accordingly, we find that defendants have failed to present affirmative evidence establishing that the "true goal" of Ms. Stoneback's claims was solely to interfere with and burden defendants' free speech and petition rights. *Sandholm*, 2012 IL 111443, ¶ 57. Therefore, despite finding that defendants were engaged in activity protected by the Act, and that the claims in Ms. Stoneback's complaint are meritless, we nonetheless affirm the circuit court's denial of defendants' motions to dismiss the complaint under the Act. See *Sandholm*, 2012 IL 111413, ¶ 53.

¶ 81    The Act is intended to prevent parties from abusing the judicial process by intimidating or harassing citizens and organizations for involving themselves in public affairs. *Id.* ¶ 43 (citing 735

ILCS 110/5 (West 2008). Thus, dismissal under the Act is not warranted merely because the challenged claims lack merit. "Dismissal of a lawsuit pursuant to the Act is a drastic and extraordinary remedy" in part because a plaintiff is required to pay defendant's attorney fees incurred in connection with the motion to dismiss. *Id.* ¶ 51. Thus, while Ms. Stoneback's complaint may still be subject to summary dismissal on remand, we find that dismissal under the Act is not warranted because the "true goal" of Ms. Stoneback's complaint was to seek redress for the defendants' allegedly defamatory actions, despite the fact that those claims are, ultimately, meritless.

¶ 82 Because we find that defendants have failed to satisfy their burden, we need not consider the third element: whether Ms. Stoneback proved by clear and convincing evidence that defendants' actions were not in furtherance of acts immunized by the Act. *Glorioso I*, 2023 IL App (1st) 211526, ¶ 66 (citing 735 ILCS 110/20(c) (West 2022)).

¶ 83 Finally, we find that affirming the circuit court's order here will not "chill" future political speech, as defendants suggest. As stated in *Sandholm*, dismissal under the Act is a drastic and extraordinary remedy. Even where, as here, the defendants were engaged in activity protected by the Act and the claims in the complaint are meritless, dismissal under the Act is not warranted if the defendants do not carry their burden under the other steps devised by the supreme court and this court. These procedural safeguards ensure that only "meritless, retaliatory SLAPPs, as they traditionally have been defined," are subject to dismissal under the Act. *Sandholm*, 2012 IL 111443, ¶ 42.

¶ 84                                    III. CONCLUSION

¶ 85 For the reasons stated, we affirm the judgment of the circuit court of Cook County and remand for further proceedings consistent with this order.

¶ 86     Affirmed and remanded.